812 A.2d 591

**PAP'S A.M. t/d/b/a Kandyland, Appellant,**

**v.**

**The CITY OF ERIE, Joyce A. Savocchio, Chris E. Maras, Mario S. Bagnoni, Robert C. Brabender, Denise Robison, and James N. Thompson, in their Official Capacities, Appellees.**

Supreme Court of Pennsylvania.

Submitted Aug. 30, 2000.

Decided Dec. 19, 2002.

376

378

Philip B. Friedman, Erie, for PAP's A.M. t/d/b/a/ Kandy-land.

Carl Max Janavitz, Pittsburgh, for North Hills News, Inc.

Michael Murray, pro hac vice, Stephen D. Shafron, pro hac vice, for Golden Triangle & Monroeville.

Paul J. Cambria, Jr., pro hac vice, for Fairview & B.L.V.D.

Gregory Alan Karle, Gerald Joseph Villella, Erie, for City of Erie, et al.

Michael McAuliffe Miller, Harrisburg, Kerry Alan Fraas, George M. Janocsko, Pittsburgh, for Allegheny County.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, SAYLOR and EAKING, JJ.

Justice CASTILLE.

This matter is before this Court upon remand following the United States Supreme Court's reversal of our decision in *Pap's A.M. v. City of Erie*, 553 Pa. 348, 719 A.2d 273 (1998) (*Pap's I* ). The issue before us in *Pap's I,* and again before us now, involves the constitutionality of a public indecency ordinance enacted by the City Council of Erie, which makes it a summary offense to appear in public in a "state of nudity." For the reasons set forth below, we find that the ordinance violates the freedom of expression provision of Article I, § 7 of the Pennsylvania Constitution. Accordingly, we reinstate our prior order, which severed the unconstitutional provisions (§§ 1(c) and 2) from the ordinance, and we reverse the order of the Commonwealth Court.

The ordinance provides, in relevant part, as follows:

1. A person who knowingly or intentionally, in a public place:

 a. engages in sexual intercourse

 b. engages in deviate sexual intercourse as defined by the Pennsylvania Crimes Code

 c. appears in a state of nudity, or

 d. fondles the genitals of himself, herself or another person commits Public Indecency, a Summary Offense.

2. "Nudity" means the showing of the human male or female genital [sic], pubic hair or buttocks with less than a fully opaque covering of any part of the nipple; the exposure of any device, costume, or covering which gives the

appearance of or simulates the genitals, pubic hair, natal cleft, perineum anal region or pubic hair region; or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of nipples and/or areola.

3. "Public Place" includes all outdoor places owned by or open to the general public, and all buildings and enclosed places owned by or open to the general public, including such places of entertainment, taverns, restaurants, clubs, theaters, dance halls, banquet halls, party rooms or halls limited to specific members, restricted to adults or to patrons invited to attend, whether or not an admission charge is levied.

4. The prohibition set forth in subsection 1(c) shall not apply to:

 a. Any child under ten (10) years of age; or

 b. Any individual exposing a breast in the process of breastfeeding an infant under two (2) years of age.

The Preamble to the ordinance suggests that it was targeted specifically at nude live entertainment and not simply at nudity *per se:*

WHEREAS, Council specifically wishes to adopt the concept of Public Indecency prohibited by the laws of the State of Indiana, which was approved by the U.S. Supreme Court in *Barnes v. Glen Theatre Inc., et al,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), **for the purpose of limiting a recent increase in nude live entertainment within the City,** which activity adversely impacts and threatens to impact the public health, safety and welfare by providing an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects. (Emphasis supplied.)

Appellant Pap's operated an establishment known as "Kandyland," which featured totally nude erotic dancing performed by women. To comply with the nudity ban in the ordinance, Pap's presumably would have had to require its dancers, at a

minimum, to cover themselves with what are commonly known as "pasties" and a "G-string"—albeit, as the unusual definition of "nudity" above reveals, such "device, costume or covering" itself would be deemed to run afoul of the "nudity" ban if the covering might be deemed to "simulate" and "give the appearance" of that which it covers. Thus, the ordinance effectively bans both actual nudity and "simulated" nudity.[1]

In *Pap's I,* the five Justices of this Court who participated in the case were unanimous in the view that the public nudity provisions of the ordinance were content-based restrictions upon expressive conduct, which did not survive constitutional challenge under a strict scrutiny analysis. This Court was also unanimous in the view that the most persuasive mode of analyzing the free expression question was that employed by the four-Justice dissenting opinion authored by Justice White in *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). *See* 719 A.2d at 279 (opinion by

1. As Justice Stevens's careful reading of the Erie ordinance demonstrates, to the extent that the definition of "nudity" applies to "costumes and coverings" that merely "simulate" the genitalia, nipples or areola, it is broader than the definition of nudity in the statute that was at issue before the Supreme Court in *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). *See City of Erie v. Pap's A.M.,* 529 U.S. 277, 330–31, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (Stevens, J., dissenting). It is worth noting that this distinction between the provisions was not argued to this Court on the previous appeal, nor was it relied upon by this Court in deciding the matter; indeed, both the majority and the concurrence assumed the ordinance here to be identical in material respect to the statute at issue in *Barnes.* Justice Stevens viewed the distinctive definition of nudity in the Erie ordinance as significant, since it rebutted the claim that the ordinance was a content-neutral one aimed at public nudity, which would be subject only to intermediate scrutiny under the First Amendment:

> Can it be doubted that this out-of-the-ordinary definition of "nudity" is aimed directly at the dancers in establishments such as Kandyland? Who else is likely to don such garments? . . . It is clear beyond a shadow of a doubt that the Erie ordinance was a response to a more specific concern than nudity in general, namely, nude dancing of the sort found in Kandyland.

*Id.* at 331, 120 S.Ct. 1382 (footnotes omitted). Justice Stevens also noted that there was ample additional evidence in the comments of the Erie city council members who approved the ordinance to prove that it was aimed specifically at nude adult entertainment and not at public nudity in general. *See id.* at 329–30 & n. 15, 120 S.Ct. 1382 (quoting comments).

Cappy, J.) (Justice White's analysis in *Barnes* dissent is directly applicable to the situation before us now); *id.* at 283 (Castille, J., concurring) (Justice White's analysis in *Barnes* dissent is persuasive and should be adopted as proper approach under Article I, § 7 of Pennsylvania Constitution).

The only division in this Court in *Pap's I* concerned whether the disputed provisions of the ordinance failed under the First and Fourteenth Amendments of the U.S. Constitution or under the separate guarantee of freedom of expression provided in Article I, § 7 of the Pennsylvania Constitution. Mr. Justice Cappy's majority opinion, which was joined by former Chief Justice Flaherty and Mr. Justice Nigro, analyzed the question under the federal Constitution. The Majority began by noting that, while the act of being nude is not in and of itself expressive conduct which is within the protection of the First Amendment, the U.S. Supreme Court has recognized that nude dancing is expressive conduct deserving of at least "some quantum of protection." The Majority then turned to the dual question of whether the Erie ordinance was related to the suppression of that expression, and thus was subject to strict scrutiny, or was content-neutral, and thus the " 'less stringent standard ... announced in *United States v. O'Brien* [, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ] for regulations of noncommunicative conduct controls.' " 719 A.2d at 277, *quoting Texas v. Johnson*, 491 U.S. 397, 403, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

On the question of content-neutrality, the Majority canvassed the various opinions in the *Barnes* decision, noting, among other things, that the four-Justice *Barnes* dissent had garnered the most joinders. Ultimately, however, the Majority concluded that, although the separate opinions in *Barnes* were instructive, "there is no United States Supreme Court precedent which is squarely on point." Accordingly, the Majority "turn[ed] to our own independent examination of the Ordinance itself to determine whether it is related to the suppression of free expression." 719 A.2d at 278–79.

Although the ordinance was drafted broadly, so as to prohibit so much as even appearing in public in a state of nudity

(or simulated nudity), the Majority noted that the City Council of Erie had stated that it adopted the provision to serve a more specific agenda, *i.e.*, for the "purpose of limiting a recent increase in nude live entertainment within the City" which, it believed, led to negative secondary effects, *i.e.*, "an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects." However, the Majority reasoned that the stated purpose of combating negative secondary effects was inextricably bound up with an "unmentioned purpose that directly impacts on the freedom of expression: that purpose is to impact negatively on the erotic message of the dance" which was presumed to be the cause of the secondary effects. In its independent analysis of the question, the Majority explicitly relied upon the reasoning in the *Barnes* dissent, which it quoted. *Id.* at 279. The Majority's conclusion that the ordinance revealed a "content-based motivation to suppress the expressive nature of nude dancing" led it to hold that it was subject to strict scrutiny, a scrutiny that required the governmental entity "to establish that the Ordinance is narrowly drawn to accomplish a compelling governmental interest." 719 A.2d at 279–80, *citing Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). The Majority then proceeded to an "independent analysis" of the strict scrutiny issue, again invoking Justice White's dissent in *Barnes* as persuasive authority, and concluded that the statute was not narrowly drawn to accomplish a compelling governmental interest. In this regard, the Majority noted that there were several narrower methods available to combat the feared secondary effects that would not involve barring the expressive activity of nude dancing. 719 A.2d at 280. Finding the unconstitutional public nudity provisions of the ordinance to be severable from the remainder of it, the Majority struck down only those provisions. Because the Majority concluded that the ordinance violated the First Amendment, it did not reach or offer any opinion upon Pap's alternative claims that the ordinance: (1) violated the freedom of expression separately

protected by Article I, § 7 of the Pennsylvania Constitution; and (2) was unconstitutionally overbroad. *Id.* at 281 n. 12.

The Concurrence by this author, which was joined by Mr. Justice (now Chief Justice) Zappala, concluded that the First Amendment federal question was controlled by the result in *Barnes,* even though *Barnes* had produced no majority opinion, because the Indiana statute in that case was similar to the Erie ordinance, and a majority of the Supreme Court had upheld the statute against a First Amendment challenge. The Concurrence noted that, in the process of upholding the statute in *Barnes,* five Justices of the Supreme Court did not subject it to strict scrutiny. *Id.* at 282–83 (Castille, J., concurring).

Instead, the Concurrence would have reversed the Commonwealth Court on appellant's separate freedom of expression state claim sounding under Article I, § 7 of the Pennsylvania Constitution. The Concurrence noted that Article I, § 7 has its own rich, independent history, and that this Court has repeatedly determined that it affords greater protection for speech and conduct than does the First Amendment. *Id.* at 283 (Castille, J. concurring) (citing cases). Like the Majority, the Concurrence viewed Justice White's dissent in *Barnes* as persuasive and would have adopted that analysis as the proper approach to be employed under Article I, § 7, in determining whether statutes of this sort involve the suppression of constitutionally protected expression. The Concurrence, like the Majority, quoted at some length from Justice White's analysis in *Barnes:*

> The purpose of forbidding people to appear nude in parks, beaches, hot dog stands, and like public places is to protect others from offense. But that could not possibly be the purpose of preventing nude dancing in theaters and barrooms since the viewers are exclusively consenting adults who pay money to see these dances. The purpose of the proscription in these contexts is to protect the viewers from what the State believes is the harmful message that nude dancing communicates....

\* \* \*

This being the case, it cannot be that the statutory prohibition is unrelated to expressive conduct. Since the State permits the dancers to perform if they wear pasties and G-strings but forbids nude dancing, it is precisely because of the distinctive, expressive content of the nude dancing performances at issue in this case that the State seeks to apply the statutory prohibition. It is only because nude dancing performances may generate emotions and feelings of eroticism and sensuality among the spectators that the State seeks to regulate such expressive activity, apparently on the assumption that creating or emphasizing such thoughts and ideas in the minds of the spectators may lead to increased prostitution and the degradation of women. But generating thoughts, ideas, and emotions is the essence of communication. The nudity element of nude dancing performances cannot be neatly pigeonholed as mere conduct independent of any expressive component of the dance.

719 A.2d at 283–84, *quoting Barnes,* 501 U.S. at 590–92, 111 S.Ct. 2456 (White, J., dissenting) (citations and footnote omitted). The Concurrence thus would have subjected the ordinance to strict scrutiny as a matter of Pennsylvania constitutional law. On the merits of the proper application of that test, the Concurrence agreed with the analysis in Mr. Justice Cappy's opinion. 719 A.2d at 283–84.

It bears noting that neither the Majority nor the Concurrence in *Pap's I* deemed itself **bound** by the *Barnes* dissent; rather, in the course of independently analyzing the freedom of expression issue in the absence of controlling federal and Pennsylvania precedent, respectively, the Majority and the Concurrence viewed the *Barnes* dissent as persuasive on the merits. Moreover, the analysis employed by the Majority in *Pap's I* was not based upon a prediction of the future course of the U.S. Supreme Court in such cases,[2] but instead was

2. In this respect, it is notable that, by the time this Court decided *Pap's I*, Justice White as well as Justices Marshall and Blackmun, two of the three Justices who joined Justice White's dissent in *Barnes,* had retired.

based upon an independent application of principle in an area fraught with jurisprudential uncertainty.

Erie sought further review of our decision by certiorari of the First Amendment question, which was granted by the U.S. Supreme Court. The High Court reversed and remanded. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). The Court first passed upon the question of justiciability, since Pap's had filed a motion to dismiss the case as moot on the ground that Kandyland was no longer operating as a nude dancing club and that Pap's was not then operating a nude dancing club at any other location in Erie. Erie opposed that motion, arguing that Pap's was still a viable corporation under Pennsylvania law; that there was a reasonable expectation that the same controversy could recur between the parties; that exceptions to the mootness doctrine applied; that the motion was untimely; and that the existence of the (unresolved) challenge based upon the overbreadth doctrine broadened the controversy to parties not directly before the Court.

The Court denied the motion to dismiss. The Court held that the case was not moot because Pap's was still incorporated under Pennsylvania law and could again decide to operate a nude dancing establishment in Erie; the fact that Erie was being prevented from enforcing the ordinance was sufficient to keep the case from being deemed moot; and Pap's still had a concrete stake in the outcome of the case, *i.e.*, it had an interest in ensuring that the decision of this Court was not overturned so that it could resume operations if it so desired. In addition, the Court noted that Pap's had not raised the question of mootness until after the Court had granted certiorari, notwithstanding that the factual basis for raising this argument existed before that time. The Court's interest in preventing litigants from manipulating its jurisdiction in order to insulate a favorable decision from review also counseled against a finding of mootness. 529 U.S. at 287–89, 120 S.Ct. 1382.[3]

3. On the question of mootness, Justice O'Connor's plurality opinion expressed a majority view, since it was joined by Justice Souter.

On the merits of the First Amendment challenge, the Court proved unable to articulate a clear majority view, although it got closer on that question than it had in *Barnes*. Justice O'Connor's four-Justice plurality opinion concluded that the Erie ordinance's restriction on public nudity was content-neutral and was aimed at combating the secondary effects of nude dancing rather than suppressing the erotic message conveyed by the nude dance; as such, the plurality concluded that the ordinance should be subject to intermediate scrutiny under the test set forth in *United States v. O'Brien* for content-neutral restrictions on symbolic speech. The plurality then concluded that the governmental objective of guarding against the perceived harmful secondary effects of nude dancing outweighed any restriction on that expressive conduct. The plurality rejected this Court's approach in *Pap's I* because it deemed that approach to merely follow Justice White's dissent in *Barnes*, which was a minority view. The plurality also discounted this Court's finding that one purpose of the statute was to impact negatively on the erotic message of the dance, deeming that "illicit motive" irrelevant, since this Court had found that the ordinance also had a proper motive, *i.e.*, to combat negative secondary effects.

Justice Scalia, joined by Justice Thomas, agreed that reversal was required, but on an entirely different basis. Consistently with his concurrence in *Barnes*, Justice Scalia deemed the Erie ordinance to be a total ban on public nudity, which was aimed at conduct, not expression, and thus was not subject to First Amendment scrutiny at all. Justice Souter filed a concurring and dissenting opinion, agreeing with the plurality that the *O'Brien* secondary effects test governed, but dissenting from the disposition because he would apply the test differently. In Justice Souter's view, the record failed to reveal "any evidence on which Erie may have relied, either for the seriousness of the threatened harm or for the efficacy of

Justice Souter filed a concurring and dissenting opinion on the First Amendment question. Justice Scalia, joined by Justice Thomas, disagreed with the Court on mootness, but wrote on the merits in light of the fact that the Court majority on that question did so. 529 U.S. at 306–07, 120 S.Ct. 1382 (Scalia, J., concurring).

its chosen remedy" and, thus, the record did not permit a conclusion "that Erie's ordinance is reasonably designed to mitigate real harms." 529 U.S. at 314, 317, 120 S.Ct. 1382. Justice Souter would have remanded the case to permit Erie to attempt to make that factual showing.

Finally, Justice Stevens, in a dissent joined by Justice Ginsburg, noted his continued agreement with Justice White's dissent in *Barnes*, and also expressed his disagreement with what he termed the Court's "mishandling" of its secondary effects precedents. In the dissent's view, the "secondary effects" of commercial enterprises featuring indecent entertainment had been deemed a legitimate basis only to regulate their location and not a basis to "justify the total suppression of protected speech." 529 U.S. at 317–18, 120 S.Ct. 1382 (Stevens, J., dissenting).

Upon remand, this Court directed the parties to brief: whether the appeal before us is moot, whether the ordinance violates Article 1, § 7 of the Pennsylvania Constitution; and whether the ordinance is unconstitutionally overbroad. The parties have complied.

## I. MOOTNESS

On the question of mootness, the parties have reversed the stances they assumed in the U.S. Supreme Court. Pap's argues that the case should not be deemed moot for the several reasons previously advanced by Erie: *i.e.*, Pap's is a viable Pennsylvania corporation which could reenter the business; there is a reasonable chance that a controversy could again arise between the parties; and Pap's' overbreadth challenge, which was not passed upon by this Court before, creates a continuing case or controversy. Pap's also notes the additional reasons cited by the Supreme Court in denying its mootness challenge, including the finding that Pap's "still has a concrete stake in the outcome." Although Pap's does not go so far as to suggest that the Supreme Court's determination on mootness necessarily binds this Court as the law of the case or as a matter of federalism, it argues that a finding of

mootness now, in a case deemed not to be moot by the High Court, would create an inconsistency. Pap's also argues that the issue presented is one of great public importance which will have an impact well beyond this case, especially in light of the nature of the Supreme Court's varying conclusions on the right of expression issue. Pap's' *amicus* echoes these arguments, and particularly emphasizes what it views as the "compelling issues of great public importance" present in the case, given the divided rationale of the U.S. Supreme Court, and the fact that the High Court's reasoning was so "strikingly opposed" to the independent reasoning of this Court on a question which also sounds under Pennsylvania's Declaration of Rights.

Erie does an about-face similar to Pap's, and without any deference to the arguments it successfully forwarded in the U.S. Supreme Court, much less deference to the Supreme Court's favorable findings in response to those arguments. Thus, Erie argues that "the controversy became moot while still before this Court in 1998." Erie also argues that this Court must undertake its own independent examination of mootness.

■ This Court generally will not decide moot questions. *See In Re Cain,* 527 Pa. 260, 590 A.2d 291 (1991); *In Re Gross,* 476 Pa. 203, 382 A.2d 116 (1978). In *Gross,* we summarized the mootness doctrine as follows:

> The cases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation. The problems arise from events occurring after the lawsuit has gotten under way—changes in the facts or in the law—which allegedly deprive the litigant of the necessary stake in the outcome. The mootness doctrine requires that an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed.

590 A.2d at 292, *quoting* G. Gunther, *Constitutional Law* 1578 (9th ed.1975).

■ Preliminarily, we do not believe that the U.S. Supreme Court's holding that this case was not moot for Article III

purposes settles the question now facing us upon remand, and particularly with respect to the Pennsylvania constitutional question that is our primary focus. For one thing, the posture of the case now is significantly different than it was when the Supreme Court ruled. At that point, there was a judgment in place from this Court severing those provisions of Erie's ordinance that we had deemed unconstitutional. That order, which would have become final had certiorari been denied, would have continued to directly affect Erie irrespective of any change in the status of Pap's. This factor, which was cited by the Supreme Court in its mootness analysis, no longer exists. Furthermore, as a review of Justice Scalia's concurring opinion makes clear, the question of mootness in a case involving certiorari review of a state court judgment on a question of federal law involves concerns of federalism that do not exist for us. 529 U.S. at 304–05, 120 S.Ct. 1382 (Scalia, J., concurring).

■ Although we do not deem ourselves bound by the U.S. Supreme Court's analysis, we are satisfied that the case is not moot, and for reasons that in many respects echo concerns of the Supreme Court.[4] First, we agree that the fact that appellant is still incorporated under Pennsylvania law weighs against a finding of mootness. In this regard, this case is analogous to *POA Co. v. Findlay Township Zoning Hearing Bd.*, 551 Pa. 689, 713 A.2d 70 (1998). In *POA,* the appellant appealed the Zoning Hearing Board's (Board's) denial of his request for a variance to allow appellant to place billboards on his property. The Board argued that the matter was moot because the Pennsylvania Department of Transportation had, in the interim, denied appellant's application for an outdoor advertising permit on the separate ground that the proposed sign was within 500 feet of an interchange. This Court held that the question of whether local zoning approval should have been granted was not moot because appellant was free to seek

4. This Court has frequently looked to cases from the U.S. Supreme Court for guidance in deciding questions of mootness. *See, e.g., Gross,* 476 Pa. at 211, 215–16 & nn. 13–14, 382 A.2d 116; *Wortex Mills v. Textile Workers,* 369 Pa. 359, 85 A.2d 851 (1952).

a permit for a sign location on its property that is not within 500 feet of an interchange once such a determination is made. *Id.* at 74 n. 11. Similarly, in the case *sub judice,* Pap's is still incorporated as a Pennsylvania corporation and, even though it no longer actively operates Kandyland or a similar establishment in Erie, it could attempt to open such an establishment. Under the reasoning in *POA,* the case is not moot.

Furthermore, the potential for employing the mootness doctrine to manipulate jurisdiction is no less present in this Court than it was in the U.S. Supreme Court. In this regard, neither party has particularly clean hands, as each has argued in favor of mootness at a point where the existing judgment, if left alone, would be to its benefit. This additional consideration, along with the significance of the question involved, particularly in light of the fractured decision of the U.S. Supreme Court, *see Gross,* 476 Pa. at 214–15, 382 A.2d 116 (discussing "great public importance exception to the mootness doctrine"), and the presence of the overbreadth challenge, which arguably implicates persons or establishments other than Pap's, reinforce our conclusion that the case is not moot.

## II. FREEDOM OF EXPRESSION UNDER ARTICLE I, SECTION 7

Pap's argues that this Court should adopt the substantive analysis in our decision in *Pap's I* for purposes of Article I, § 7 of the Pennsylvania Constitution, *i.e.* that we should conclude that the Erie ordinance is a content-based restriction that burdens the Pennsylvania right to freedom of expression, subject the ordinance to strict scrutiny, and conclude that it cannot stand. Citing this Court's decision in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991), Pap's accurately notes that, on questions sounding under our state charter, this Court is not bound by decisions of the U.S. Supreme Court on similar federal provisions, but may find that Pennsylvania provides greater protection for individual rights. *See Edmunds,* 586 A.2d at 894 ("we are not bound by the decisions of the United States Supreme Court which interpret similar (yet

distinct) federal constitutional provisions"). Pap's further notes that this Court already has recognized that our Declaration of Rights was the "direct precursor of the freedom of speech and press," *see Edmunds*, 586 A.2d at 896, and that this Court has long construed the freedom of expression provision in Article I, § 7 as providing greater protection of expression than its federal counterpart. Pap's adds that other states also have provided greater protection for expression under their state charters than has been afforded by the U.S. Supreme Court under the First Amendment. Brief for Appellant at 15 (citing cases from New York and Washington).

In arguing that we should adopt the analysis in *Pap's I* as a matter of Pennsylvania constitutional law, Pap's notes the state of flux resulting from the U.S. Supreme Court's precedents in this particular area, including its fractured decision in this case. Relying upon Justice Stevens's dissent, Pap's argues that we should not follow the most recent, uncertain teachings of that Court because the secondary effects approach adopted by the High Court plurality (and also approved in theory by a fifth Justice, *i.e.*, Justice Souter) involved "dramatic changes" in prior First Amendment legal doctrine. Pap's suggests that the appropriate approach is not that dramatic change, but the analysis this Court employed when it was obliged to confront this freedom of expression question without the benefit of controlling federal authority. Applying that analysis, Pap's argues that the Erie ordinance violates Article 1, § 7 because its purpose and effect is to suppress protected expressive conduct. According to Pap's, the ordinance seeks to prohibit nude dancing precisely because of its communicative attributes. Brief for Appellant at 17 (citations and quotation omitted).

In response, Erie does not dispute that Article I, § 7 has been a source for greater protection of individual rights, but it maintains that the Pennsylvania and federal protections of expression "are nearly co-extensive." Citing to *Western Pennsylvania Socialist Workers v. Connecticut General Life*

*Ins. Co.*, 512 Pa. 23, 515 A.2d 1331 (1986) (plurality opinion by Hutchinson, J.), Erie concedes (in a point we discuss below) that the very structure of Pennsylvania government differs from the federal model, and it differs in a fashion which necessarily requires a "more expansive protection of speech" than is provided by the First Amendment. Erie also concedes that expressive conduct, like the nude dancing at issue here, is subject to some level of protection under Article I, § 7. Like Pap's, Erie suggests that the constitutional analysis set forth in *Edmunds* is an appropriate model for deciding the question here. Erie also acknowledges that this Court has in the past specifically rejected, on state constitutional grounds, less protective First Amendment authority in the area of free speech. Erie maintains, however, that this greater protection has been, and should continue to be, confined to the area of prior restraints and censorship.

Erie argues that, for purposes of our inquiry into its ban on public nudity and nude dancing, the intermediate scrutiny standard outlined in *United States v. O'Brien* for symbolic speech is compatible with Article I, § 7. Citing to the approaches outlined by the Justices of the U.S. Supreme Court who agreed that the *O'Brien* test controls, Erie argues that nude dancing is expressive conduct, and not "pure speech." Erie thereby suggests that this Court should construe Article I, § 7 as requiring a similarly graduated approach to free expression issues, *i.e.*, that expressive conduct should be subject to a diluted protection under Article I, § 7. As such, expressive conduct, in Erie's view, should be subject to reasonable regulation without that regulation being deemed to have an impermissible impact on the communicative nature of the conduct. Erie also argues that there is no existing tradition of subjecting expressive conduct to strict scrutiny under the Pennsylvania Constitution. Erie concludes that its ban "places a limit on expression" which should be deemed consistent with Article I, § 7 because that provision should be construed as "tolerat[ing] a balancing of competing interests." Brief for Appellees, 19.

Although Erie has forwarded a cogent and able argument, for the reasons set forth below, we believe that this ordinance, which on its face prohibits all public nudity (and simulated nudity), but which unquestionably was targeted at nude live dancing such as was performed at Kandyland, violates the freedom of expression guaranteed Pennsylvania citizens by Article I, § 7. As a Pennsylvania constitutional matter, we adopt the unitary analysis that both the Majority and the Concurrence in *Pap's I* actually employed—albeit for different reasons—when this Court rendered its independent judgment in *Pap's I.* As we will explain below, we believe that this analysis—as conducted by Mr. Justice Cappy for the Court in *Pap's I*—also is consistent with a less restrictive means analysis this Court already has employed in Article I, § 7 cases involving restrictions on commercial speech. Adoption of such a unitary standard, we believe, adequately balances the fundamental right and governmental interests involved, and will also provide a consistent and ascertainable standard to govern future questions under Article I, § 7.

We agree with the parties that the nude dancing that is targeted for elimination by the Erie ordinance is expressive conduct that is subject to protection under Article I, § 7. We believe this is so not only for the reasons articulated in precedent of the U.S. Supreme Court so holding, *see City of Erie v. Pap's A.M.*, 529 U.S. at 289, 120 S.Ct. 1382 (citing cases), but also for the reasons expressed in Justice White's dissent in *Barnes*, which were echoed by both the Majority and the Concurrence in *Pap's I.* The fact that nude adult entertainment of the sort performed at Kandyland "may not ascend to the level of high art form," *see Pap's I*, 719 A.2d at 284 (Castille, J., concurring), does not mean that the expression is unprotected. *See generally Miller v. Civil City of South Bend*, 904 F.2d 1081, 1089–1104 (7th Cir.1990) (Posner, J., concurring) (outlining, *inter alia*, long history of erotic and nude dancing and explaining why it must be deemed expressive conduct), *reversed sub nom. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

■ We also agree with the parties that it is helpful to conduct our Pennsylvania constitutional analysis, to the extent possible, consistently with the model suggested by *Edmunds*.[5] Under *Edmunds*, the Court should consider: the text of the relevant Pennsylvania Constitutional provision; its history, including Pennsylvania case law; policy considerations, including unique issues of state and local concern and the impact on Pennsylvania jurisprudence; and relevant cases, if any, from other jurisdictions. *Edmunds*, 586 A.2d at 895. A consideration of the question in light of these factors convinces us that the challenged provisions of the Erie ordinance cannot stand.

Freedom of expression has a robust constitutional history and place in Pennsylvania. The very first Article of the Pennsylvania Constitution consists of the Pennsylvania Declaration of Rights, and the first section of that Article affirms, among other things, that all citizens "have certain inherent and indefeasible rights." Among those inherent rights are those delineated in § 7, which addresses "Freedom of Press and Speech; Libels." That section provides, in the part relevant here, that:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

PA. CONST. Art. I, § 7.[6] Section 25, entitled "Reservation of Powers in People," then provides that:

> To guard against transgressions of the high powers which we have delegated, we declare that everything in this article

5. Although the instant claim sounds under Article I, § 7, and not Article I, § 8, which was at issue in *Edmunds*, *Edmunds* spoke to the appropriate analysis of Pennsylvania constitutional claims as a class.

6. The text of Article I, § 7 in the current Constitution, which was adopted in 1968, is the same as that contained in each of this Commonwealth's Constitutions since 1790. In the Commonwealth's first Constitution, adopted in 1776, the Declaration of Rights stated:

> That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained.

is excepted out of the general powers of government and shall forever remain inviolate.

*Id.* § 25.

The text of the First Amendment of the federal Constitution provides, in relevant part, that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press. . . ." U.S. CONST. Amend. I. As a purely textual matter, Article I, § 7 is broader than the First Amendment in that it guarantees not only freedom of speech and the press, but specifically affirms the "invaluable right" to the free communication of thoughts and opinions, and the right of "every citizen" to "speak freely" on "any subject" so long as that liberty is not abused. "Communication" obviously is broader than "speech." Nevertheless, we do not overstate this distinction, since the U.S. Supreme Court has long construed the First Amendment as encompassing more than what constitutes purely speech; indeed, it has recognized that nude dancing is "expressive conduct" that falls within the First Amendment, albeit the Court deems it to be a form of expression falling only within its "outer ambit," thus warranting a lesser degree of protection. *City of Erie v. Pap's A.M.*, 529 U.S. at 289, 120 S.Ct. 1382 (citing cases).

A second distinction has to do with the very structure of Pennsylvania government. Erie recognizes this distinction by quoting the following observation by Justice Hutchinson in his plurality opinion in the *Western Pennsylvania Socialist Workers* case:

The United States Constitution established a government of limited and enumerated powers. Consequently, the national government possesses only those powers delegated to it. . . . State constitutions, on the other hand, typically establish governments of general powers, which possess all powers not denied by the state constitution. . . . Our state constitution functions this way and restrains these general powers by a Declaration of Rights.

515 A.2d at 1334 (citations omitted). *Accord* 515 A.2d at 1340 (Zappala, J., concurring) ("The federal government possesses limited powers delegated by the states and enumerated in the United States Constitution. The state government possesses general powers founded on the authority of the people, with the exception of certain matters as to which the powers of the state are limited and the rights of the people are declared inviolable."). What this Court said in *Spayd v. Ringing Rock Lodge*, 270 Pa. 67, 113 A. 70 (1921), respecting the freedom to petition, is no less true for the right to free expression guaranteed by the Declaration of Rights:

> The right in question is a fundamental one, expressly recognized in the organic law of our state as belonging to "citizens." In other words, it is possessed by members of the state, or "citizens" (*United States v. Cruikshank*, 92 U.S. 542, 549, 23 L.Ed. 588 [ (1875) ] ) to work out the public weal, rather than by individuals, to protect their persons or property or serve private ends. The Constitution does not confer the right, but guarantees its free exercise, without let or hindrance from those in authority, at all times, under any and all circumstances; and, when this is kept in view, it is apparent that such a prerogative can neither be denied by others nor surrendered by the citizen himself.

> \* \* \*

> Since the fundamental law forbids the violation of such a prerogative by the government itself, neither the courts nor any minor tribunal may ignore the inhibition.

*Id.* at 71.

This Court also has long recognized that freedom of expression has special meaning in Pennsylvania given the unique history of this Commonwealth. In addition to the honored place of our Constitution, which predated the U.S. Constitution, in the annals of American constitutional law—a history detailed by Mr. Justice Cappy speaking for the Court in *Edmunds, see* 586 A.2d at 896–97—Pennsylvania, of course, was the home both of its founder, William Penn, and of

Andrew Hamilton. As this Court noted in *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981), freedom of expression:

has special meaning for this Commonwealth, whose founder, William Penn, was prosecuted in England for the "crime" of preaching to an unlawful assembly and persecuted by the court for daring to proclaim his right to a trial by an uncoerced jury. It is small wonder, then, that the rights of freedom of speech, assembly, and petition have been guaranteed since the first Pennsylvania Constitution, not simply as restrictions on the powers of government, as found in the Federal Constitution, but as inherent and "invaluable" rights of man.

*Id.* at 1388 (footnote omitted). Philadelphia lawyer Andrew Hamilton's defense of John Peter Zenger played no less direct a role in both the federal and Pennsylvania protection of the freedom of the press and, hence, expression. As Justice Bell noted in *In re Mack*, 386 Pa. 251, 126 A.2d 679 (1956):

Freedom of the press—the right to freely publish and fearlessly criticize—was a plant of slow growth. It did not spring full-grown as Minerva did from the brow of Jupiter, nor rise as quickly as did the warriors when Cadmus sowed the dragon's teeth. It was planted by many hardy, freedom-loving souls and nurtured by public opinion for several centuries before it grew to be a tree of gigantic stature. Government both in England and the United States constantly tried to suppress or destroy it. Freedom of the press became a recognized inherent Right only after and as a result of the famous Zenger libel case in New York City in 1735. In that case Zenger's lawyer, Andrew Hamilton of Philadelphia, argued vigorously for the right of a newspaper to criticize freely and truthfully the acts and conduct of governmental officials. The Court refused to recognize the theory of freedom of the press, or permit Hamilton to prove "Truth" as a defense; nevertheless the jury, ignoring the charge of the Court, acquitted Zenger. Public opinion rallied to the cause which Hamilton pleaded and freedom of the press gradually became recognized as an inalienable Right which was ordained and affirmed in the Constitution

of the United States and in the Constitution of Pennsylvania. . . .

*Id.* at 683–84 (Bell, J., concurring and dissenting) (footnote omitted).

The protections afforded by Article I, § 7 thus are distinct and firmly rooted in Pennsylvania history and experience. The provision is an ancestor, not a stepchild, of the First Amendment. Nor did Pennsylvania's protection of freedom of expression remain dormant until the First Amendment became applicable to the states. In addition to the fact that we must assume that Pennsylvania legislators, executives, and judges were all true to their oaths of fidelity to our Constitution, and thus were careful to guard against encroachment, this Court has not been hesitant to act to ensure these fundamental rights.

█ At this mature date in Pennsylvania constitutional history, it cannot be denied, and Erie candidly does not dispute, that Article I, § 7 "provides protection for freedom of expression that is broader than the federal constitutional guarantee." *Commonwealth, Bureau of Professional & Occupational Affairs v. State Bd. of Physical Therapy*, 556 Pa. 268, 728 A.2d 340, 343–44 (1999) (commercial speech case), *citing Insurance Adjustment Bureau v. Insurance Comm'r*, 518 Pa. 210, 542 A.2d 1317, 1324 (1988) (same). *Accord Tate* (political leafleting on college campus deemed protected expression under Article I, § 7); *Goldman Theatres v. Dana*, 405 Pa. 83, 173 A.2d 59 (1961), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961) (statute providing for censorship of motion pictures violates Article I, § 7). "It was, of course, not until the Fourteenth Amendment was adopted in 1868 that the freedoms of speech and press were accorded *federal* protection against adverse state action." *Goldman Theatres*, 173 A.2d at 62 n. 2 (emphasis original). But this Court was frequently called upon to interpret Article I, § 7 long before the passage of the Fourteenth Amendment provided a basis for application of the First Amendment against the states; *i.e.*, before there was an applicable federal interpretation to

follow or diverge from. *See, e.g., Respublica v. Dennie,* 4 Yeates 267, 1805 WL 911 (Pa.1805).

Our interpretations of the scope of the fundamental rights addressed in Article I, § 7 have continued from passage of the Civil War Amendments to the federal Constitution and up to the present day. *E.g. Barr v. Moore,* 87 Pa. 385 (1878), 87 Pa. 385, 1878 WL 13369; *Briggs v. Garrett,* 111 Pa. 404, 2 A. 513 (1886); *Erdman v. Mitchell,* 207 Pa. 79, 56 A. 327 (1903); *Spayd, supra; Goldman Theatres, supra; Tate, supra; Insurance Adjustment Bureau, supra; Bureau of Professional & Occupational Affairs, supra.* The independent constitutional path that has been forged under Article I, § 7 has been comprehensive. It has not been confined to freedom of speech, the press, or expression. *E.g., Spayd, supra* (freedom of expression and freedom to petition issues arising in context of rule imposed by labor association). Moreover, contrary to Erie's argument, within the cases involving freedom of expression, the broader protections afforded by Article I, § 7 have not been confined to situations involving censorship and prior restraints. *See, e.g., Bureau of Professional & Occupational Affairs, supra* (less restrictive means analysis (rather than intermediate scrutiny) governs Article I, § 7 review of statute regulating commercial speech); *Insurance Adjustment Bureau, supra* (same); *Tate, supra* (political leafleting on college campus deemed protected expression under Article I, § 7, thus requiring reversal and discharge of convictions for disorderly conduct). Furthermore, even when we have disapproved of restrictions upon expression because a prior restraint was involved, we have emphasized that, "the purpose underlying such a prohibition [on prior restraints] is to effectuate the constitutional guarantee of freedom of expression." *Tate,* 432 A.2d at 1388 (discussing *Goldman Theatres* ). It bears noting that, although we have looked to federal law for guidance or context in many of these cases, the judgments rendered were strictly pursuant to Pennsylvania constitutional command.

Turning to questions of policy, we conclude that those concerns strongly counsel that this Court give life to its

independent judgment in *Pap's I* and hold that this ordinance is unconstitutional. We begin by emphasizing the unique posture of this case. This is not a situation where the task before us is—or was in *Pap's I*—to determine whether a clear holding of the United States Supreme Court or this Court on a specific federal constitutional question is also persuasive as a Pennsylvania constitutional matter. *Compare Commonwealth v. Shaw,* 564 Pa. 617, 770 A.2d 295 (2001) (rejecting, as inconsistent with separate and distinct privacy protections of Article I, § 8 of Pennsylvania Constitution, Fourth Amendment holding in *Commonwealth v. Riedel,* 539 Pa. 172, 651 A.2d 135 (1994)); *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769, 776 (1996) (rejecting U.S. Supreme Court's Fourth Amendment holding in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) as "incompatible with the privacy rights guaranteed to the citizens of this Commonwealth under Article 1, § 8 of the Pennsylvania Constitution"); *Commonwealth v. Edmunds, supra* (rejecting Fourth Amendment holding in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) as incompatible with Article I, § 8; "Article I, Section 8 of the Pennsylvania Constitution does not incorporate a 'good faith' exception to the exclusionary rule"); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283, 1289 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980) (rejecting Fourth Amendment holding in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) under Article I, § 8; "we believe *Miller* establishes a dangerous precedent, with great potential for abuse"). In the cases above, the question presented was whether or not to depart from known, controlling federal constitutional holdings.

■ In contrast, in the case *sub judice,* the governing federal law was in a state of flux at the time *Pap's I* was before us—and it remains so, albeit to a somewhat lesser extent. That circumstance creates a difficult situation when Pennsylvania constitutional rights are separately invoked. *See Commonwealth v. Perry,* 798 A.2d 697, 719 & nn. 1 & 3 (Pa.2002) (Saylor, J., concurring) (noting uncertainty that can

arise in state constitutional doctrine as result of "fundamental changes" in corresponding federal jurisprudence effectuated by U.S. Supreme Court); *accord Matos, supra* (rejecting U.S. Supreme Court's definition of "seizure" in *Hodari D.* for purposes of Article I, § 8, in part because Pennsylvania had consistently followed previous definition of seizure established in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497. (1980) and anticipated in *Commonwealth v. Jones,* 474 Pa. 364, 378 A.2d 835 (1977)). This is particularly problematic because, as this Court recognized over eighty years ago, the fundamental rights guaranteed by the Pennsylvania Declaration of Rights "cannot lawfully be infringed, even momentarily. . . ." *Spayd,* 113 A. at 72.

Thus, it is not surprising that, in similar situations, this Court has not hesitated to render its independent judgment as a matter of distinct and enforceable Pennsylvania constitutional law. *See, e.g., Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992). In *Smith,* this Court granted relief under the double jeopardy clause of the Pennsylvania Constitution, Article I, § 10, and discharged the defendant, premised upon prosecutorial misconduct which was "intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." 615 A.2d at 325. In rendering this judgment, we noted that we had theretofore held the double jeopardy clause of the Pennsylvania Constitution to be coextensive with the federal double jeopardy clause. We also recognized that, under the then-prevailing federal standard, it was not clear whether the prosecutorial misconduct at issue in *Smith* would have barred retrial. The uncertainty of the result under the evolving federal standard, however, did not deter us from effectuating our separate judgment under the Pennsylvania Constitution: "Regardless of what may be required under the federal standard, however, our view is that the prosecutorial misconduct in this case implicates the double jeopardy clause of the Pennsylvania Constitution." *Id. See also Commonwealth v. Martorano,* 559 Pa. 533, 741 A.2d 1221 (1999) (applying *Smith*).

A similar situation arose under Article I, § 7 in our commercial speech decision in *Insurance Adjustment Bureau,*

*supra.* There, the challenged statute prohibited public adjusters from soliciting clients within twenty-four hours of a fire or similar catastrophe, where the catastrophe was the basis for the solicitation. Appellant Bureau challenged the statute on grounds that, *inter alia,* it violated the free expression provisions of the federal and Pennsylvania Constitutions. This Court began by noting that commercial speech was not deemed protected under the federal First Amendment until 1976. 542 A.2d at 1319–20. After conducting the minimum analysis required under the First Amendment (since Pennsylvania can afford no less protection), and suggesting that the statute failed under that test, this Court nevertheless struck the statute down under Article I, § 7. In forging our own path in the commercial speech arena, this Court, in a unanimous opinion, emphasized the uncertainty in the federal test as well as specific Pennsylvania constitutional concerns:

> The federal analysis requires that a court determine, ultimately, whether the regulation is more extensive than necessary to accomplish a legitimate, important governmental purpose. Fundamentally, this determination requires a balancing of the interests of government against those of the entity or individual whose speech has been regulated, and this balancing will depend upon the perspective of the balancer. **Reasonable minds can disagree as to how extensive any given regulation should be with respect to its purpose, and the perspective of the United States Supreme Court on this issue may not be the same as that of a court within a state jurisdiction. The differences of opinion may be based in part on differing jurisprudential theories of the function and responsibilities of government, but they may be based also on a regional, versus a national perspective.**

> Our perspective is that in the commercial speech area, **we should tread carefully where restraints are imposed on speech if there are less intrusive, practicable methods available to effect legitimate, important government interests.** Here, the balance of interests should be resolved

in favor of the challenger because less intrusive methods were available to effect the governmental objectives.

We hold, therefore, that the Pennsylvania Constitution, Article I, Section 7, will not allow **the prior restraint or other restriction** of commercial speech by any governmental agency where the legitimate, important interests of government may be accomplished practicably in another, less intrusive manner. . . .

542 A.2d at 1324 (emphases supplied). *See also Bureau of Professional & Occupational Affairs, supra,* 728 A.2d at 343–44 (where commercial speech is not misleading, Court engages in "an analysis of whether, for purposes of the Pennsylvania Constitution, there were available less restrictive means by which the government could have accomplished its objective"), *applying Insurance Adjustment Bureau.*[7]

We recognize that, when this Court issued its decision in *Pap's I,* the Majority holding was rendered under the First Amendment. Nevertheless, the case is not unlike *Smith* and *Insurance Adjustment Bureau* in that we were required to effectuate a judgment, on a claim sounding under both Constitutions, in a circumstance where the governing federal jurisprudence was both unclear and in a state of change. As Mr. Justice Cappy noted in *Pap's I,* the nearest case on point was *Barnes,* but the *Barnes* Court had "splintered and produced four separate, non-harmonious opinions." 719 A.2d at 277. As a result, "there [was] no United States Supreme Court precedent which [was] squarely on point." *Id.* at 278. We thus were left to conduct "our own independent examination of the Ordinance itself to determine whether it is related to the

7. Of course, this Court has also proceeded to decide claims exclusively under Article I, § 7, notwithstanding that the challenge was also raised or cognizable under the First Amendment. *See Tate,* 432 A.2d at 1384 n. 2 (because Court decided case under Pennsylvania Constitution, it would not reach First Amendment claim); *Goldman Theatres,* 173 A.2d at 64–65 (holding that state requirement that motion pictures be submitted to Board of Censors violated Article I, § 7, notwithstanding that Court recognized possibility that such requirement might not have violated First Amendment). In addition, this Court has engaged in an exclusive state constitutional analysis when such is the manner in which the claim is presented to us. *See Bureau of Professional & Occupational Affairs,* 728 A.2d at 342 n. 1; *Spayd, supra.*

suppression of free expression." *Id.* at 278–79. It is not insignificant that, when this Court considered the question of whether the Erie ordinance unconstitutionally burdened the right to free expression in its independent judgment, and without clear majority guidance from the U.S. Supreme Court, we unanimously decided that it did. That such was the view of all Justices who heard the case weighs heavily in our determination under Article I, § 7 here.[8]

■ The difference between this Court's analytical approach to the ordinance in *Pap's I,* and the approach followed by the U.S. Supreme Court plurality upon further review, primarily has to do with our determination that it was relevant to the question of whether the ordinance was content-based, and thus burdened protected expression, that one of its "unmentioned" purposes was "to impact negatively on the erotic message of the dance." We deemed that purpose to be "[i]nextricably bound up with th[e] stated purpose" of the ordinance, which was to combat negative secondary effects. *Pap's I,* 719 A.2d at 279. Citing our finding that the stated goal of the ordinance was to combat the negative secondary effects associated with nude dancing, the plurality in the U.S. Supreme Court essentially deemed the purpose to eradicate protected expression to be irrelevant, and therefore would have applied an intermediate scrutiny test under *O'Brien.* *City of Erie v. Pap's A.M.,* 529 U.S. at 291–92, 120 S.Ct. 1382. The *O'Brien* test requires, *inter alia,* a determination of whether "the restriction is no greater than is essential to the furtherance of the government interest." *Id.* at 301, 120 S.Ct. 1382. Because Justice Souter agreed that the *O'Brien* test applied, he also apparently would have deemed Erie's purpose of burdening expressive conduct to be irrelevant. Nevertheless, Justice Souter would have applied the *O'Brien* test in a stricter fashion than the plurality, as he would require a demonstration of the evidentiary basis for the secondary ef-

8. The fact that the majority opinion in *Pap's I* was rendered under the First Amendment does not mean that the independent judgment we effectuated was "not representative of the law of this Commonwealth pertaining to" the Pennsylvania Constitution. *Matos,* 672 A.2d at 774 n. 7 (construing Article I, § 8).

fects alleged and the efficacy of the ordinance in addressing those effects, and no such linkage was shown of record here.

For purposes of Pennsylvania constitutional analysis, it is notable that a majority of the U.S. Supreme Court, in consideration of this case, approved the *O'Brien* test, which requires that the restriction be no more extensive than necessary to accomplish the government interest. That test is the analytical equivalent of the test which this Court rejected in the commercial speech cases under Article I, § 7. *See Insurance Adjustment Bureau*, 542 A.2d at 1324 (discussing First Amendment test that "requires a court to determine, ultimately, whether the regulation is more extensive than necessary to accomplish a legitimate, important governmental purpose" and adopting, instead, Article I, § 7 test that focuses on availability of less intrusive means of achieving governmental objective). It is also notable that the five Justices in the U.S. Supreme Court who agreed that the *O'Brien* test applied could not agree upon the precise evidentiary showing which would be required to satisfy that test.[9] That circumstance illustrates why we rejected, as a Pennsylvania constitutional matter, a similar balancing test under Article I, § 7 in *Insurance Adjustment Bureau*, *i.e.*, we were concerned because "[r]easonable minds can disagree as to how extensive any given regulation should be with respect to its purpose, and the perspective of the United States Supreme Court on this issue may not be the same as that of a court within a state jurisdiction," and the resulting "differences of opinion may be based in part on differing jurisprudential theories of the function and responsibilities of government, but they may be based also on a regional, versus a national perspective." 542 A.2d at 1324.

9. In the recent case of *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), five Justices of the U.S. Supreme Court appeared to endorse the approach of the *Pap's* plurality concerning the evidentiary requirement in intermediate scrutiny cases. However, *Alameda Books*, like *Pap's*, did not produce a single majority opinion. *See Alameda Books*, 122 S.Ct. at 1736–37 (four-Justice plurality opinion); *id.* at 1741 (Kennedy, J., concurring in the judgment) (agreeing with plurality on this point).

A narrow way of stating the questions now before us is whether there is something in Article I, § 7 and our jurisprudence under that provision that both: (1) requires us to deem the obvious additional purpose of this ordinance to burden protected expression to be irrelevant to the question of its constitutionality; and (2) requires us to analyze the provision under *O'Brien*-type intermediate scrutiny, notwithstanding the U.S. Supreme Court's continuing inability to agree upon the precise operation of that test, and notwithstanding that we have rejected just such a test in the commercial speech arena in our unanimous opinion in *Insurance Adjustment Bureau.* We think there is not.[10]

**10.** Neither Pap's nor Eric cite cases from other states which address the specific question presented here. We have found no cases from other states, filed since the Supreme Court's decision in *City of Erie v. Pap's A.M.* which address our question; this is not surprising, given how recent the decision is. In the nine years between the plurality decisions in *Barnes* .and *City of Erie v. Pap's A.M.*, however, a number of state courts addressed the constitutionality of restrictions on nude dancing.

In these cases, either no separate state constitutional analysis was undertaken or, if one was, it followed the lead of the plurality in Barnes: *i.e.*, the courts viewed the question under the *Barnes* plurality's approach, which would adopt *O'Brien* intermediate scrutiny, notwithstanding that that test had not yet been explicitly adopted by a majority of the Supreme Court. *See, e.g., DPR, Inc. v. City of Pittsburg*, 24 Kan.App.2d 703, 953 P.2d 231, 245 (1998) (ordinance prohibiting totally nude dancing is constitutional under *O'Brien* test); *Village of Winslow v. Sheets*, 261 Neb. 203, 622 N.W.2d 595, 602–04 (2001) (ordinance establishing criteria for operation and design of businesses offering nude dancing is constitutional under *O'Brien* analysis); *Knudtson v. City of Coates*, 519 N.W.2d 166, 169–70 (Minn.1994) (claim raised under Minnesota constitution; decided by employing *Barnes* analysis to conclude that state may impose restrictions on nudity in bars); *City of Las Vegas v. 1017 South Main Corp.*, 110 Nev. 1227, 885 P.2d 552, 555 (1994) (ordinance regulating zoning of sexually-oriented businesses is constitutional under *Barnes* rationale); *Ino Ino v. City of Bellevue*, 132 Wash.2d 103, 937 P.2d 154, 166–69 (1997) (*O'Brien* test is applicable standard for determining whether ordinance regulating distance between nude dancers and customers is constitutional; discussing both state and federal constitution, but ultimately applying federal test because state constitution deemed no more protective in this context); *Lounge Mgt., Ltd. v. Town of Trenton*, 219 Wis.2d 13, 580 N.W.2d 156, 161 (1998) (invalidating nude dancing ordinance under secondary effects test adopted by *Barnes* plurality). *Accord Tily B. v. City of Newport Beach*, 69 Cal.App.4th 1, 81 Cal.Rptr.2d 6 (1999); *City of Colorado Springs v. 2354, Inc.*, 896 P.2d 272 (Colo.1995); *Goldrush II v. City of Marietta*, 267 Ga. 683, 482 S.E.2d 347 (1997); *Chambers v.*

Certainly, there is nothing in the text or history of Article I, § 7 that commands such a view. Although this Court has often followed the lead of the U.S. Supreme Court in matters of free expression under Article I, § 7, doing so here is no easy matter, even if we were obliged or inclined to. The position of the decisive Supreme Court concurrence by Justice Scalia—a position rejected by seven other Justices on the High Court—that this ordinance does not raise a question of protected expression at all finds no support in our jurisprudence. Nor does the concurrence offer any illumination on the proper application of the *O'Brien* standard, since the concurrence would have sustained the ordinance on grounds that it did not implicate protected expression at all. Meanwhile, the five Justices who agreed that *O'Brien* should apply disagreed upon the application of that intermediate scrutiny test. Their disagreement on the application of the test they deemed governing necessarily triggers the very concern that led this Court to go its own way under Article I, § 7 in the commercial speech area: *i.e.*, the concern that a standard which balances the stated purpose of a statute against the extent of its impact upon protected expression is one upon which "reasonable minds can disagree" and therefore affords insufficient protection to fundamental rights guaranteed under Article I, § 7.

We are left, then, with a circumstance where we must decide a Pennsylvania constitutional question, but the governing federal law, to which we ordinarily would look for insight and comparison, has been fluid and changing and still is not entirely clear. As a matter of policy, Pennsylvania citizens should not have the contours of their fundamental rights

*Peach County*, 266 Ga. 318, 467 S.E.2d 519 (1996); *State v. Bouye*, 325 S.C. 260, 484 S.E.2d 461 (1997). Such unexplained decisions following the *Barnes* plurality are not persuasive reasons to adopt a similar approach under Article I, § 7. *See Edmunds*, 586 A.2d at 900. This is particularly so given the very factors which led to the complication in *Pap's I*, *i.e.*, the inability of the U.S. Supreme Court to arrive at a majority approach to the question. In addition, the considerations already detailed above, including Pennsylvania's strong tradition of independent interpretation of its Declaration of Rights in general, and Article I, § 7, in particular, make these cases unpersuasive. This *Edmunds* factor is, at best, equivocal.

under our charter rendered uncertain, unknowable, or changeable, while the U.S. Supreme Court struggles to articulate a standard to govern a similar federal question. There is an entirely different jurisprudential and constitutional imperative at work when this Court, which is the final word on the meaning of our own charter in a properly joined case or controversy, is charged with the duty to render a judgment. In addition, it is a settled principle of Pennsylvania jurisprudence that a provision of the Pennsylvania Constitution may, in appropriate circumstances, provide broader protections than are afforded by its federal counterpart.

 Our review of the distinct history of Article I, § 7, as well as the Pennsylvania policy concerns we have touched on above, convinces us that there is nothing that requires, or even counsels us, to view this ordinance in the light adopted by the U.S. Supreme Court plurality. When this matter was before us in *Pap's I,* we proceeded without specifically governing federal authority, and we engaged in our own independent analysis of whether the ordinance burdened protected expression and, if so, whether it could survive strict scrutiny. On the question of whether the ordinance was related to suppressing free expression, we approached the ordinance in a common sense fashion. In this analysis, we deemed it relevant that an obvious purpose of the ordinance was to directly burden freedom of expression itself, *i.e.,* "the erotic message of the dance" and thus we detected a "content-based motivation to suppress the expressive nature of the dance." Nothing in the independent history of Article I, § 7 requires us to discount the considered view of all Justices who heard this case in *Pap's I* that one obvious purpose of this ordinance was to suppress protected expression, and that that purpose says volumes about whether this ordinance was content-based. Accordingly, we affirm, under Article I, § 7, both the approach taken in *Pap's I,* and its unanimous finding that the ordinance is content-based.

 We also independently hold, pursuant to Article I, § 7, that an intermediate level of scrutiny, such as is set forth

in *O'Brien,* is inappropriate where expressive conduct such as the nude dancing at issue here is involved. Our experience in this case convinces us of the wisdom of our observations in *Insurance Adjustment Bureau* of the perils in the intermediate scrutiny test when protected expression is at issue. We conclude that regulations aimed at barring nude dancing, no less than regulations of protected commercial speech, require that we "tread carefully where restraints are imposed ... if there are less intrusive, practicable methods available to effect legitimate, important government interests." 542 A.2d at 1324. Although the expression at issue here is not political speech (as it is not in the commercial speech arena), nevertheless we are satisfied that it is communication within the contemplation of Article I, § 7. It is hardly onerous to require that a regulation that would seek to govern such expression, offered in a closed establishment to consenting adult patrons, be accomplished by a narrower, less intrusive method than the total ban on expression adopted here.

On the application of this standard, we need not add much more to what was articulated in Mr. Justice Cappy's Majority Opinion in *Pap's I,* discussing strict scrutiny. *See* 719 A.2d at 279–80 (under strict scrutiny, Erie must establish that the regulation be "narrowly drawn to accomplish a compelling governmental interest") (citation omitted). We view Justice Cappy's strict scrutiny analysis to be compatible with the less intrusive means analysis articulated in *Insurance Adjustment Bureau.* Justice Cappy reasoned as follows:

The most compelling governmental interest which could be articulated in connection with the Ordinance is the interest in deterring sex crimes. It is beyond cavil that curbing crimes such as prostitution and rape is a compelling governmental interest.

Yet, that determination satisfies only one half of the strict scrutiny test. It still must be established that the Ordinance is narrowly tailored to meet this compelling interest. On this front, we come to the inescapable conclusion that the Ordinance must fail. We agree with Justice White's statement in *Barnes* that there are several ways to combat

these social ills without banning the expressive activity of nude dancing. Justice White suggested that "the State could perhaps require that, while performing, nude performers remain at all times a certain minimum distance from spectators, that nude entertainment be limited to certain hours, or even that establishments providing such entertainment be dispersed throughout the city." *Barnes*, 501 U.S. at 594, 111 S.Ct. 2456.... These restrictions, unlike the restrictions found in the Ordinance, could be viewed as content-neutral restrictions on the time, place, and manner in which nude dancing could be conducted, and, if so, would not trigger the strict scrutiny test.

Furthermore, we also find it highly circuitous to prevent rape, prostitution, and other sex crimes by requiring a dancer in a legal establishment to wear pasties and a G-string before appearing on stage. We believe that imposing criminal and civil sanctions on those who commit sex crimes such as prostitution or rape would be a far narrower way of achieving the compelling governmental interest.

719 A.2d at 280. Since the legitimate governmental goals in this case may be achieved by less restrictive means, without burdening the right to expression guaranteed under Article I, § 7, we hold, as we did in *Pap's I*, that this ordinance is unconstitutional, albeit our holding now rests exclusively upon the Pennsylvania Constitution.[11]

The order of the Commonwealth Court is reversed and, as in *Paps I*, we sever §§ 1(c) and 2 of the Erie ordinance. 719 A.2d at 280–281.

Justice NEWMAN did not participate in the consideration or decision of this case.

Justice SAYLOR files a dissenting opinion.

11. Because we hold that the ordinance is unconstitutional under Article I, § 7, we do not consider Pap's' alternative argument that it is unconstitutionally overbroad.

Justice SAYLOR, dissenting.

Although a historical basis exists within the Court's Article I, Section 7 jurisprudence for extending greater protection to communication than that provided under the First Amendment, such enhanced protection has previously been applied to forms of pure speech as opposed to the communicative aspects of conduct or symbolic speech. *See, e.g., Commonwealth v. Tate,* 495 Pa. 158, 168–171, 432 A.2d 1382, 1387–88 (1981). I am thus reluctant to accord the prior cases controlling significance where, as here, the regulation at issue facially applies to conduct. Moreover, I would give some weight to the stated purpose of the ordinance, namely, to combat the negative secondary effects of crime caused by the presence of adult entertainment establishments, and evaluate the ordinance under the intermediate scrutiny test articulated in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

Nevertheless, as the majority notes, there are legitimate concerns with "unmentioned purposes" of regulations such as the one at issue here and the extent to which protected expression may be impacted. Rather than extending the strict scrutiny test to this area, however, I would adopt as a matter of our constitutional jurisprudence under Article I, Section 7, the more stringent application of the *O'Brien* test proposed by Mr. Justice Souter in his concurring opinion in *City of Erie v. Pap's A.M.,* 529 U.S. 277, 310–13, 120 S.Ct. 1382, 1402–04, 146 L.Ed.2d 265 (2000) (Souter, J., concurring), and require an evidentiary basis for the alleged secondary effects and the remedial effect of the proposed regulation. Such requirement, in my view, adequately accommodates the historic concerns of Article I, Section 7, and appropriately balances legitimate governmental interests with the points articulated by the majority. As the record in this case is insufficiently developed under this standard, I would remand to the trial court for an evidentiary hearing. *Accord City of Erie v. Pap's A.M.,* 529 U.S. at 310–13, 120 S.Ct. at 1402–04 (Souter, J., concurring).