**COMMONWEALTH of Pennsylvania**

v.

**Janice HAAGENSEN, Appellant.**

Commonwealth Court of Pennsylvania.

Argued May 9, 2006.
Decided June 2, 2006.

---

Paul D. Boas, Pittsburgh, for appellant.

Kim M. Watterson, Pittsburgh, for appellee.

BEFORE: FRIEDMAN, Judge, and SIMPSON, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

Before this court are the consolidated appeals of Janice Haagensen from five March 18, 2005, orders of the Court of Common Pleas of Lawrence County (trial court) finding Haagensen guilty of interference with the lawful taking of wildlife, a summary offense, in violation of sections 2302(a.1)(2) and (7) of the Game and Wildlife Code (Hunter Harassment Statute or HHS), 34 Pa.C.S. § 2302(a.1)(2) and (7). In her appeal, Haagensen challenges these sections of the HHS as unconstitutional, both facially and as applied to her, under the First and Fourteenth Amendments to the United States Constitution and Article 1, section 7 of the Pennsylvania Constitution.[1] Alternatively, Haagensen contends that the Commonwealth did not establish that she violated the HHS. We reverse based on Haagensen's alternate argument, and, therefore, we do not address the constitutional issues raised.[2]

Haagensen has lived on a farm at 349 New Road in Enon Valley, Pennsylvania for over thirty years. She neither hunts nor permits hunting on her property, and she posts her property each year. These signs and the fences bordering her property are frequently torn down or destroyed, and she has often observed hunters armed with rifles on her property. Over the years, Haagensen has reported this activity to the police; however, no one has been cited or arrested, and the incidents continue. (R.R. at 244a–50a.)

In December of 2001, within the span of one week, Haagensen received five citations for hunter harassment in violation of sections 2302(a.1)(2) and (7) of the Hunter Harassment Statute.[3] (R.R. at 1a–7a.)

1. The text of the First Amendment of the federal constitution provides, in relevant part, that, "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. 1. This prohibition has been interpreted to apply to state governments through the Fourteenth Amendment. Article I, section 7 of the Pennsylvania Constitution provides, in relevant part, that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." PA. CONST. art. I, § 7. Our supreme court has stated that Article I, section 7 provides protection for freedom of expression that is broader than the federal constitutional guarantee in that it guarantees not only freedom of speech but also specifically affirms the invaluable right to freely communicate thoughts and opinions and the right of every citizen to speak freely on any subject, so long as that liberty is not abused. Pap's A.M. v. City of Erie, 571 Pa. 375, 812 A.2d 591 (2002).

2. It is well-settled that when a case raises both constitutional and non-constitutional issues, a court should not address the constitutional question if the case can properly be decided on non-constitutional grounds. Ballou v. State Ethics Commission, 496 Pa. 127, 436 A.2d 186 (1981).

3. Haagensen was cited on December 13, 2001, for violating 34 Pa.C.S. § 2302(a.1)(2) for alleged misconduct occurring on December 1, 2001; Haagensen was cited on December 13, 2001, for violating 34 Pa.C.S. § 2302(a.1)(7) for alleged misconduct occurring on December 1, 2001; Haagensen was cited on December 10, 2001, for violating 34 Pa.C.S. § 2302(a.1)(2) for alleged misconduct occurring on December 8, 2001; Haagensen was cited on December 10, 2001, for violating

The relevant portions of the Hunter Harassment Statute read as follows:

### § 2302. Interference with lawful taking of wildlife or other activities permitted by this title prohibited

(a) General rule.—Except as otherwise provided in this title, it is unlawful for another person at the location where the activity is taking place to *intentionally* obstruct or interfere with the *lawful* taking of wildlife or other activities permitted by this title.

(a.1) Activities which violate section.[4]—A person violates this section when he *intentionally or knowingly:*

. . .

(2) blocks, impedes or *otherwise harasses* another person who is engaged in the process of *lawfully* taking wildlife or other permitted activities;

. . .

(7) enters or remains upon public lands or upon private lands without permission of the owner or their agent, with *intent* to violate this section; . . .

34 Pa.C.S. §§ 2302(a), 2302(a.1)(2) and (7) (italics added). Simply stated, section 2302(a.1)(2) of the HHS makes it a crime to knowingly or intentionally "harass" a hunter who is lawfully hunting, and section 2302(a.1)(7) of the HHS makes it a crime to enter on public or private lands with the intent to "harass" such a hunter. The HHS provides no definition for the term "harass."

Haagensen pled not guilty in each case, but she was convicted of all five offenses before a magistrate in April of 2002. Haagensen then filed timely appeals to the trial court from these summary convictions. *De novo* hearings were held on Haagensen's appeals, with testimony taken on July 28, 2004, August 6, 2004, and October 8, 2004, regarding the incidents at issue.[5] That testimony may be briefly summarized as follows.

### 789–790 C.D. 2005

The first incident involves "victim" Michael McBride. He testified that, on December 1, 2001, he was hunting with a few friends and family members on the McBride property, which abuts Haagensen's land. Michael McBride stated that he asked his friend, Nate Aikens, to stay in

---

34 Pa.C.S. § 2302(a.1)(2) for alleged misconduct occurring on December 8, 2001; and Haagensen was cited on December 17, 2001, for violating 34 Pa.C.S. § 2302(a.1)(2) for alleged misconduct occurring on December 3, 2001.

4. Section 2302(a.1) of the HHS lists eight different activities that violate the HHS. In addition to the sections at issue here, the HHS makes it a summary offense to: (1) drive or disturb wildlife for the purpose of disrupting the lawful taking of wildlife; (3) use natural or artificial stimuli to affect wildlife behavior in order to hinder or prevent the lawful taking of wildlife; (4) create or erect barriers with the intent to deny ingress or egress to areas where the lawful taking of wildlife is permitted; (5) interject oneself into the line of fire; (6) affect the condition or placement of personal or public property intended for use in the lawful taking of wildlife

in order to impair its usefulness or prevent its use; and (8) fail to obey the order of any officer who observes conduct that violates this section. 34 Pa.C.S. §§ 2302(a.1)(1), (3)-(6), (8).

5. Prior to the *de novo* hearings on these appeals, Haagensen filed a motion to dismiss the citations, alleging that sections 2302(a.1)(2) and (7) of the HHS are unconstitutional both facially and as applied to the facts of her case. (R.R. at 13a–15a, 18a–19a) Following argument on Haagensen's motion, the trial court issued an order, dated February 27, 2004, denying Haagensen's motion to dismiss the citations based on the facial unconstitutionality of the disputed HHS provisions, but the trial court reserved ruling on Haagensen's unconstitutional application motion until the facts specific to the case could be developed at hearings. (R.R. at 22a–25a.).

a particular spot and wait for the others to push some deer in his direction. According to Michael McBride, the spot was close to, but not on, Haagensen's property. Michael McBride testified that, later, he heard screaming, went to where Aikens was sitting and saw that Haagensen was yelling loudly at Aikens. On cross-examination, Michael McBride conceded that Haagensen only complained about people trespassing on her property; she did not threaten anyone, block anyone's shot or chase away any deer. Michael McBride stated that he asked Haagensen to leave, and she did. (R.R. at 168a–77a.)

Aikens testified that he had been invited to go hunting with the McBrides and that Michael McBride had posted him in a spot and told him not to cross the path or he would be on someone else's property. Aikens said that, while he was at the assigned location, Haagensen confronted him screaming and yelling that he should get out because he was illegally hunting on her property. (R.R. at 182a–84a.) Aikens said that when Michael McBride subsequently arrived, he told Haagensen that this was McBride property; Michael McBride then walked farther into McBride property and told Haagensen, "Now, you are on my property, please leave." Aikens stated that Haagensen left and called the state police. (R.R. at 186a–87a.)

Christian Winter, a Pennsylvania State Trooper, testified that Haagensen called him to complain that Michael McBride and his friends were hunting on her property; however, Trooper Winter stated that he later filed citations against Haagensen based on information received from speaking to Michael McBride and Aikens. (R.R. at 194a–96a.) On cross-examination, Trooper Winter confirmed that Haagensen reported that hunters were trespassing and, thus, illegally hunting on her property. (R.R. at 196a–98a.)

With respect to this incident, Haagensen testified that she was driving down the road and glimpsed orange at the top left-hand corner of her property, indicating that hunters were going in. Haagensen stated that she drove into a driveway on her property, got out of the car and walked toward the hunters. She testified that, when Michael McBride and Aikens saw her approach, they started back toward the McBride property, but they were still on her land when she got to them. (R.R. at 272a–73a.)

### 791 C.D. 2005

This incident involved "victim" Lester McBride, Michael McBride's father. Lester McBride testified that on December 8, 2001, he was hunting with a group of approximately eight other persons in a section of woods that he owned, and while they were involved in a "drive"[6] near the boundary of Haagensen's property, Haagensen confronted some of the men in the group, yelling that they were on her property. Lester McBride testified that everyone walked to the road and talked to Trooper Todd Scott, at which point Haagensen claimed that people were trespassing on her property, and McBride denied the accusation. (R.R. at 129a–35a.) On cross-examination, Lester McBride acknowledged that there were, in fact, hunters trespassing on Haagensen's property at the time, but McBride insisted that the trespassers were not part of his group. Lester McBride also acknowledged that he had not filed a roster for his hunting party because he did not think there were enough hunters to require such a filing. (R.R. at 135a–44a.)

---

**6.** Putting on a "drive" is a hunting technique in which a few hunters walk through the area pushing the animals towards other hunters strategically placed in certain areas.

Trooper Scott confirmed that Haagensen complained to him about hunters trespassing on her property, and he agreed that Haagensen would have a right to tell trespassers to leave. Trooper Scott also acknowledged that when Lester McBride denied being on Haagensen's property, he never mentioned that there were persons outside his group trespassing on Haagensen's land. Trooper Scott stated that he later cited Haagensen based on the information he received from McBride. (R.R. at 154a–64a.)

With respect to this incident, Haagensen testified that she saw cars dropping off hunters and that she walked along the gas line where she knew they would be going. She stated that, first, she was on a neighbor's property where she was allowed; she then crossed onto her own property, and when she saw hunters, she started screaming at them to get off her property. (R.R. at 263a–70a.)

### 792 C.D. 2005

This incident involved "victim" George Anthony Stevenish. Stevenish testified that, on December 8, 2001, he was hunting with his son on property where they had permission to hunt when he saw Haagensen get out of a vehicle and begin screaming. He stated that Haagensen appeared extremely agitated and walked up a power line to where he and his son were hunting, yelling at them to get out and waving her hands. According to Stevenish, when he and his son walked away to avoid a confrontation, Haagensen followed for a short time but stopped when he and his son reached the top of the hill. Stevenish said that he and his son then left for home but ran into Trooper Scott and stopped to talk to him. (R.R. at 103a–05a.) On cross-examination, Stevenish admitted that he did not know where Haagensen's property line started, and he acknowledged that Haagensen never threatened him, struck

him, put up barriers or chased deer away. (R.R. at 107a–11a.) Stevenish's fourteen-year-old son offered similar testimony, (R.R. at 116a–20a.)

Trooper Scott testified that he spoke to both Haagensen and the Stevenishes separately. He stated that he saw Haagensen first and that she was agitated; she said that she had seen hunters walking toward her property and that she told them to leave. Trooper Scott stated that he later issued citations to Haagensen based on what the Stevenishes told him of the incident. (R.R. at 122a–23a.)

With respect to this incident, Haagensen testified that she witnessed a hunter going straight into her woods, and, so, she parked on the property of her neighbor, Harry Lindsey, where she was allowed, and approached the hunter on foot. Haagensen stated that when she was part of the way up, other hunters shouted out "look out, she's coming," and someone fired a shot close to her. She said that, at that point, she screamed "you're on private property" and then turned and went back down. According to Haagensen, on the way down, hunters screamed, "you bitch, we'll kill you." Haagensen acknowledged speaking to Trooper Scott and demanding that the people leave her property. (R.R. at 257a–61a.)

### 793 C.D. 2005

This incident involved "victim" Kathy Ferrigno. Gary Ferrigno, the "victim's" husband, testified that, on December 3, 2001, he and his wife were hunting on a farm across the street from Haagensen's property, and Mrs. Ferrigno was to wait in a set location by the road for her husband to drive the deer down toward her. He stated that his wife called later to say that she was scared because Haagensen was driving back and forth on the road, beeping her horn and yelling. Mr. Ferrigno

testified that, when he reached his wife, Haagensen drove up to them and started yelling, "You can't hunt deer here, this ain't your property, you are too close to the road." (R.R. at 40a–41a.) Mr. Ferrigno stated that, at that point, he and his wife decided to drive up the road to another spot; however, Haagensen followed them, continued to yell and threatened to call the police. (R.R. at 42a–43a.) On cross-examination, Mr. Ferrigno estimated that, at the first location, his wife was standing with her loaded rifle about ten yards from the public road. (R.R. at 45a–47a.)

Trooper Clyde Jones, who responded to Haagensen's complaint about the Ferrignos, testified that when he arrived on the scene, Haagensen explained that the Ferrignos were trespassing on her property. Trooper Jones stated that he ascertained that the Ferrignos were not trespassing and, after hearing their story, later issued two citations to Haagensen. (R.R. at 62a–64a.) On cross-examination, Trooper Jones admitted that Haagensen may also have complained that the Ferrignos were hunting too close to the road, but that he did not act on that. (R.R. at 64a–66a.)

Kathy Ferrigno testified that she was standing with her loaded rifle by some bales of hay facing away from the road when Haagensen began driving back and forth yelling at her to get out. She stated that she called her husband to come down, and, in the meantime, Haagensen stopped her vehicle and was honking and screaming at her. She further stated that, when she and her husband decided to go somewhere else, Haagensen followed them and continued to yell. (R.R. at 72a–75a.) On cross-examination, Mrs. Ferrigno stated that, in her first position, she was at least ten feet from the road. (R.R. at 76a–77a.)

With respect to this incident, Haagensen testified that she saw Kathy Ferrigno with a rifle on a hay bale in the public road; therefore, she drove by and told her that she could not shoot from that position and had to get out. Haagensen also stated that when Mr. Ferrigno arrived, he threatened to kill her and, so, she left and called the police. Haagensen said that when the police officer finally arrived, he refused to take her statement and, instead, told her to shut up because the hunters were doing nothing wrong. Haagensen stated that, as a result of her treatment, she called to register a complaint about the officer and, shortly thereafter, began to receive the citations. Haagensen denied ever following the Ferrignos to a second location.[7] (R.R. at 250a–57a.)

On March 18, 2005, the trial court issued five opinions finding Haagensen guilty of

---

7. In addition to her own testimony, Haagensen also offered several witnesses on her behalf. At one hearing, Barbara Brest testified as a character witness, describing Haagensen as an honest, trustworthy, non-violent person. (R.R. at 84a.) At a later hearing, Brest further testified that, while she was seated outside the courtroom, she heard Lester McBride say that he was going to go onto Haagensen's property to get a big buck. (R.R. at 310a–11a.) Duane Arisman testified that he owns property abutting Haagensen's farm and that he allows Haagensen to come onto his property. He stated that, although he hunts, he and Haagensen have always gotten along, and she has never yelled at him. (R.R. at 87a–88a.) Evallynn Welling testified that she had worked with Haagensen at Neighborhood Legal Services, where Haagensen was considered honest, kind and trustworthy. (R.R. at 113a–14a.) Harry Lindsay testified regarding a past incident when a bullet fired by a hunter traveled over Haagensen's property and became embedded into the wall of his house. Lindsay also stated that he always permitted Haagensen onto his property and that she was a good neighbor; he said that Haagensen never argued or gave him a hard time when he hunted on his own property. (R.R. at 306a–10a.)

each of the five offenses in question.[8] In doing so, the trial court first held that the HHS provisions were constitutional on their face. The trial court concluded further that because Haagensen engaged in the type of conduct which the Hunter Harassment Statute sought to prohibit, its provisions were constitutionally applied to Haagensen. Finally, the trial court concluded that the Commonwealth had presented evidence sufficient to convict Haagensen of each of the alleged offenses by proving that she did in fact harass the victims and interfere with their hunt. (Haagensen's brief, Appendix A–1—E–1.)

Haagensen. filed timely appeals from these summary convictions to this court,[9] and, thereafter, we granted Haagensen's motion to consolidate the appeals.[10]

With regard to the merits of the case, Haagensen argues that, even assuming the constitutionality of the HHS, the trial court erred in concluding that the Commonwealth met its burden of proving that Haagensen violated the HHS.[11] We agree.

It was the Commonwealth's burden to establish all the necessary elements of a violation of the disputed HHS provisions. Thus, the Commonwealth had the burden to prove not only that Haagensen interfered with the victims' hunt by screaming at them or following them but also that she did it *intentionally* for no reason other than to prevent the *lawful* taking of wildlife. The trial court, in each case, found that Haagensen had no legitimate purpose for her actions and/or intended to interfere with a lawful hunt.[12] However, after a

8. In each case, Haagensen was sentenced by the trial court to pay the costs of prosecution and pay a fine. The fines ranged from $50.00 to $500.00. (R.R. at 8a–12a.)

9. Our scope of review is limited to determining whether there has been an error of law or whether the findings of the trial court are supported by competent evidence. *Blobner v. Commonwealth*, 144 Pa.Cmwlth. 100, 600 A.2d 708 (1991).

10. Haagensen filed a brief in support of her appeal, and the American Civil Liberties Union of Pennsylvania (ACLU) filed an amicus brief in support of Haagensen's appeal; however, the Commonwealth is not participating in the case.

11. Haagensen also maintains that she could not have violated section 2302(a.1)(2) of the HHS in Nos. 791 C.D. 2005 and 793 C.D. 2005 because the alleged victims in those cases (Kathy Ferrigno and Lester McBride) were violating hunting laws, and the HHS only prohibits a person from harassing someone who is *lawfully* hunting wildlife. According to Haagensen, Lester McBride conceded that he was hunting with a group of more than five hunters without having filed a roster, and, therefore, he was not lawfully hunting. *See* section 2324 of the Code, 34 Pa.C.S. § 2324; 58 Pa.Code § 141.42(a) (providing

that rosters are required for groups of five or more persons who are members of a permanent camp and hunt together). Moreover, Kathy Ferrigno and her husband both testified that she was standing with a loaded weapon within twenty-five feet of a public road, and, therefore, she was not lawfully hunting. *See* section 2504 of the Code, 34 Pa.C.S. § 2504 (making it unlawful for any person, after alighting from a motor vehicle driven along a public highway or road, to shoot at any wild bird or wild animal within 25 yards of the traveled portion of the public highway or road). However, given our disposition here, we need not address this issue.

12. Specifically, with respect to the McBride incidents, the trial court found that Haagensen's yelling had interfered with the McBrides' hunt because deer are less likely to run towards hunters if there is a lot of noise around them, and, therefore, the hunters were unable to enjoy their hunt as they would have absent Haagensen's interference. The trial court also found that Haagensen went onto private lands to harass a hunter and did, in fact, do so when she walked onto the McBride property and remained there over the objections of the owner until her purpose, the ruining of the hunt, was complete. (Haagensen's brief, Appendix A–1—C–1.) With regard to the Stevenish incident, the

careful review of the record, we cannot identify any evidence presented by the Commonwealth to support such findings.

Haagensen testified that she felt she had a right to protest the actions of the "victims" here because, in the cases of the McBrides and Stevenish, she believed that the hunters were *unlawfully* trespassing on her property, and, in Ferrigno's case, she believed that Kathy Ferrigno was *illegally* hunting too close to a public road. The trial court completely disregarded this testimony and, in fact, did not mention it at all in its five extremely brief opinions. In doing so, the trial court impliedly believed the version of events offered by the Commonwealth's witnesses. However, even accepting the testimony of the Commonwealth witnesses, there is nothing in that testimony to refute Haagensen's position regarding the motivation for her actions.

To the contrary, Michael McBride, Lester McBride, Aikens, Trooper Winter and Trooper Scott each testified that Haagensen's agitation and complaints all related to hunters trespassing on her property. Lester McBride even acknowledged that hunters were, in fact, trespassing on Haagensen's property during the December 8, 2001, incident, and he conceded that when Haagensen reacted, she had no way of knowing that those hunters were not a part of McBride's group. In the case of the Ferrignos, Gary Ferrigno testified that Haagensen's shouts were in the nature of reprimands about hunting too close to the public road, and Trooper Jones also acknowledged such a complaint. In addition, the record establishes that it was Haagensen, not the "victims," who called the authorities in these cases. This evidence supports the conclusion that Haagensen believed, either rightly or wrongly, that the "victims" here were engaging in the *unlawful* taking of wildlife,[13] and Haagensen merely sought to warn the hunters not to trespass on her property or hunt illegally near her farm.[14] *See Commonwealth v. Wheaton*, 409 Pa.Super. 622, 598 A.2d 1017 (1991) (holding that, by complaining and threatening to sue, the defendant's intent was not to harass but to serve a legitimate purpose, where he believed that the water association improperly intended to shut off his water).

Because the Commonwealth's evidence fails to support a finding that Haagensen acted with the *intent* to interfere with the *lawful* taking of wildlife, the trial court erred in concluding that the Commonwealth sustained its burden of proof. Accordingly, we reverse the trial court to the extent it found that Haagensen violated sections 2302(a.1)(2) and (7) of the Hunter Harassment Statute.

---

trial court found that Haagensen harassed the victims by yelling at them and following them as they tried to walk away from the situation, that these acts had no legitimate purpose because the victims were lawfully and rightfully hunting and that Haagensen had no legitimate reason to harass them. (Haagensen's brief, Appendix D–1.) As to the Ferrigno incident, the trial court found that Haagensen followed the couple to the next location and continued screaming at them while the victims were lawfully engaged in hunting for no other reason than to get Kathy Ferrigno to stop hunting. (Haagensen's brief, Appendix E–1.)

13. There is nothing in the record to indicate that Haagensen ever knowingly interfered with lawful hunting. In fact, Haagensen's neighbors testified that she was respectful of their right to hunt on their own property and never interfered with their lawful pursuits.

14. Interestingly, at least one jurisdiction's hunter harassment statute specifically states that "harassing conduct" does not include a landowner's action to enforce the trespass law. *See State v. Miner*, 556 N.W.2d 578 (Minn.Ct.App.1996).

## ORDER

AND NOW, this 2nd day of June, 2006, the orders of the Court of Common Pleas of Lawrence County, dated March 18, 2005, are hereby reversed.