IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Appeal of G.S., a Minor, by and through his Parents, Erin and Jason Snyder, | : : : : | |
| Appellants | : | No. 843 C.D. 2020 |
| | : | |
| From the Decision by the Rose Tree Media School District, A Local Agency | : : : : | |
| | | |
| Appeal of G.S., a Minor, by and through his Parents, Erin and Jason Snyder | : : : : | |
| | : | |
| From the Decision by the Rose Tree Media School District, a Local Agency | : : : : | No. 869 C.D. 2020 |
| | : | |
| Appeal of: Rose Tree Media School District | : : | ARGUED: September 22, 2021 |

BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge[1]
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MARY HANNAH LEAVITT, Judge[2]
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION BY JUDGE CEISLER                          FILED: January 7, 2022

Currently before us are the consolidated cross-appeals of G.S., a Minor, by and through his Parents, Erin and Jason Snyder (G.S.), and the Rose Tree Media School District, A Local Agency (School District), both of which challenge the

---

[1] The Court reached the decision in this case prior to the conclusion of President Judge Emeritus Brobson's service on the Commonwealth Court.

[2] This matter was assigned to the panel before January 3, 2022, when President Judge Emerita Leavitt became a senior judge on the Court.

Court of Common Pleas of Delaware County's (Common Pleas) July 27, 2020 order, whereby Common Pleas partially affirmed and partially reversed the School District's decision to expel G.S. from Penncrest High School.[3] This expulsion resulted from the School District's determination that G.S. had violated its Student Discipline Code by posting violent song lyrics on Snapchat,[4] despite the fact that G.S. had put up the offending post at a time when he was neither on-campus nor involved in school activities. In doing so, the School District concluded that G.S.' post constituted harassment, was a terroristic threat, and had disrupted the school environment. On appeal, Common Pleas held that the School District's terroristic threat determination was not supported by substantial evidence, but upheld G.S.' expulsion on the other two bases. We conclude that the School District's decision to expel G.S. violated his constitutionally protected right to free speech. As such, we affirm Common Pleas' order in part on alternate grounds and reverse that order in part.

## I. Background

The incident that ultimately gave rise to these cross-appeals occurred when G.S. was 16 and in 11th grade at Penncrest. Reproduced Record (R.R.) at 102a-03a, 635a, 955a, 961a. On April 1, 2018, G.S. used his personal smartphone to post the following on Snapchat, where he had 60 to 65 followers, including 4 or 5 other School District students:

> Everyone, I
> despise everyone!
> Fuck you,
> eat shit,
> blackout,

---

[3] Penncrest is located in Media, Pennsylvania.

[4] Snapchat is a popular social media application.

the world is a graveyard!
All of you, I
will fucking
kill off all of
you! This is
me, this is
my, snap!

*Id.* at 465a, 633a, 966a. Though G.S. did not tag his post as such, the words it contained were copied from "Snap," a song by the death metal band Spite.[5] The only alteration G.S. made in his post to the excerpted lyrics was to add several exclamation points. *Id.* at 65a-66a, 601a, 604a, 640a, 827a-28a. G.S. did not direct this post toward any particular person or group and did not tag any other Snapchat users in it, nor did he put up this post at a time when he was involved in school-related activities. Rather, he posted while at an Easter Sunday celebration with his extended family in New Jersey. *Id.* at 28a, 124a, 176a-77a, 182a, 200a, 303a, 399a, 600a, 710a.

Once G.S. released his Snapchat post, other users took notice and independently reposted screenshots of it through different social media applications, including one who tagged their repost on Instagram with the phrase "@penncrest_students." *Id.* at 50a-51a, 55a-56a, 143a, 458a-61a, 952a-54a. Around 4:00 p.m. that day, a parent of another Penncrest student called the Pennsylvania State Police (PSP) barracks at Media and told a PSP trooper about G.S.' Snapchat post. The parent then went to the barracks, showed the post to the trooper and then emailed him a screenshot. *Id.* at 19a-20a. The trooper visited G.S.' residence shortly thereafter, discovered that neither he nor his parents were home, and then reached out to an assistant district attorney from the Delaware County District Attorney's

---

[5] Death metal is "a type of heavy metal music that is characterized by the use of dark, violent, or gory imagery." *Death Metal*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/death%20metal (last visited Jan. 6, 2022).

Office. *Id.* at 21a-24a. In response, that assistant district attorney signed off on charging G.S. with the crime of terroristic threats, due to the violent sentiment contained in G.S.' post. *Id.* at 24a. Just before 6:00 p.m., the trooper contacted Joseph Fuhr, Penncrest's vice principal, told Fuhr that he was preparing criminal charges against G.S., and read the contents of the post to Fuhr over the phone. *Id.* at 24a-26a, 101a-03a. Fuhr then notified Norman Harrison, Penncrest's principal, about the situation, who then relayed the information to James Wigo, the School District's superintendent. *Id.* at 105a-06a, 200a-05a, 370a-71a. At this point, neither local law enforcement nor School District officials were aware of the true provenance of G.S.' post and, instead, were operating under the presumption that it constituted a legitimate threat of violence. *See id.* at 18a-27a, 103a-04a, 129a-37a.

Thereafter, the trooper called G.S.' father and asked him to bring G.S. to the Media barracks for questioning. *Id.* at 28a. G.S., along with his parents, his sister, and his attorney, voluntarily appeared at 8:30 p.m. that night. *Id.* at 28a-29a. While under questioning from the trooper, G.S. admitted that the post was his, but said that it was just a snippet of lyrics from "Snap" and that he did not intend to harm anyone. *Id.* at 29a-33a. The trooper passed this information along to another assistant district attorney, who told the trooper to keep investigating G.S. and to move forward by charging G.S. with terroristic threats, as well as with harassment. *Id.* at 34a-36a. G.S. was then arrested, his phone was confiscated, and he was taken to a nearby juvenile detention center where he was held. *Id.* at 37a-41a.[6]

---

[6] On October 15, 2018, Common Pleas adjudicated G.S. delinquent on the charge of terroristic threats. This decision was subsequently reversed on appeal by the Superior Court, which determined that the record evidence did not support an adjudication of delinquency on that charge. *See In the Interest of G.S.* (Pa. Super., No. 3420 EDA 2018, filed Dec. 20, 2019), slip op. at 4-12, 2019 WL 6999903, at *2-*6.

Throughout the day, a number of community members contacted both Harrison and Wigo, sending them screenshots of G.S.' post and expressing fear about what it portended. *Id.* at 202a-03a, 248a-50a, 372a, 442a-43a. As such, Wigo concluded that G.S.' post had become a School District-wide concern and resolved to notify the broader School District community about the situation. *Id.* at 372a, 422a-23a, 807a. At 9:45 p.m., Wigo issued a community-wide telephonic message stating that the School District was aware of G.S.' post, that law enforcement was investigating the matter, and that the School District "considered [G.S.] to [have made] serious threats of violence towards others [through his post]". *Id.* at 372a-80a, 807a, 1001a. This was supplemented by information on the School District's main webpage and through an email to School District parents, both of which conveyed a similar sentiment to that of the telephonic message. *Id.* at 372a-80a, 422a-26a, 807a-08a, 1001a. These messages were based upon the information Wigo had at that time, as he did not then know that G.S. had been arrested or that the worrying post consisted entirely of song lyrics. *Id.* at 214a-15a, 400a, 424a, 465a-66a, 496a-97a, 508a.

The following morning witnessed a notable disruption to normal operations at Penncrest. Roughly 25 percent of the student body was absent from school on April 2, 2018, a large increase over a normal day's number. *Id.* at 388a-89a. Those who were present appeared to be anxious and upset, with many students and their families seeking assurances from staffers that the school was safe. *Id.* at 211a-13a, 381a-85a, 440a-41a. In addition, there was an increased police presence on campus. *Id.* at 381a-83a, 384a-87a, 808a-09a. Not helping matters was the fact that another Penncrest student had separately made additional threats on social media prior to the start of the school day. *Id.* at 497a-99a, 508a-09a. At approximately 9:35 a.m., Wigo

5

issued another message to School District parents, stating that G.S. was in PSP custody and that it appeared that other students had been or could be encouraged by G.S.' post to make threats of their own; at that time, Wigo had not seen the second student's post, but had only been told that it was of a threatening nature. *Id.* at 390a-92a, 437a-39a, 496a-500a, 521a-24a. In this message, Wigo stated, in part, that

> [w]e no longer have the luxury of trying to discern a credible threat from one that is intended to disrupt lives. Every threat is considered to be credible. . . . There is no protection and no excuse for someone who willfully uses electronic or any other media source to disrupt the emotional and physical safety of our students, their families, or our staff and their families, and we will take every action necessary to protect the good members of the educational community.

*Id.* at 954a.

While this was occurring, G.S. remained in custody at the juvenile detention center, where he underwent a court-ordered psychological evaluation later that day; this evaluation was given by Agnes Habony, a licensed psychologist and certified school psychologist. *Id.* at 955a. After meeting with G.S., Dr. Habony determined, in relevant part, that

> [a]t this time, [G.S.'] profile does not present with a level of underlying anger, depression, or aggressive tendencies that have the potential to explode into an incident of crisis proportions. His [Snapchat post] is a duplication of emotionally charged lyrics found in a . . . song that, while disturbing in content and audio, represent a low level of threat to the community. Specifically, [G.S.] does not have the resources, motivation, or intent to carry out the threat. [G.S.'] attraction to the song is based mostly on the rhythm, tempo, and high energy of the music. [G.S.] is remorseful for having posted the lyrics and hopes to return home as soon as possible. His level of risk for future violent behavior is [l]ow.

6

*Id.* at 959a. As such, Dr. Habony concluded that "[G.S.] is . . . able to return to the community until his next court hearing" with certain, minor conditions, including family supervision, a family psychological evaluation, counseling, and drug testing. *Id.* at 959a-60a. Dr. Habony also emphasized that "[G.S.] should be earning credits toward his high school degree. He is earnest in being motivated to achieve academically." *Id.* at 960a. In keeping with Dr. Habony's recommendations, G.S. was subsequently released from juvenile detention the following day, April 3, 2018, and was placed on house arrest. *Id.* at 753a-54a, 971a.

On April 4, 2018, Principal Harrison sent a letter to G.S.' parents informing them that he was suspending G.S. for 10 days, to be served between April 2, 2018, and April 13, 2018, due to his conclusion that G.S. had violated the School District's Student Discipline Code by making terroristic threats and disrupting the school environment through his Snapchat post. *Id.* at 968a. Harrison stated in this letter that these violations constituted Level IV misconducts[7] and that he would be moving forward with an informal hearing for G.S. as a result. *Id.*

On April 9, Harrison sent another letter to G.S.' parents notifying them that the suspension period had been changed to April 5, 2018, through April 18, 2018, that G.S. was now being charged with harassment and making terroristic threats, which were both Level IV misconducts, and that the informal hearing would be held on April 10, 2018. *Id.* at 970a. At the informal hearing, G.S. reiterated that his Snapchat post had simply contained lyrics from a song that he liked and that he had

---

[7] The School District's Student Discipline Code grades misconducts on a four-level scale from Level I, which is the least serious, to Level IV, the most severe. Level IV is defined as "[a]ctions resulting in violence to another person or property, or posing a direct threat to the safety of others. These actions are clearly criminal and must require administrative reactions resulting in the immediate removal of the student from school. The intervention of law enforcement agencies/authorities and/or action by the [S]chool [B]oard will ensue." R.R. at 982a-83a.

7

not intended to threaten anyone or to commit a crime. *Id.* at 971a. In addition, Harrison was informed that G.S. and his family had undergone psychological evaluations after G.S. had been arrested, and that both evaluations had concluded that G.S. posed a low risk to the community. *Id.*[8]

On April 10, 2018, Superintendent Wigo informed G.S.' parents that he had elected to move forward by scheduling an informal pre-expulsion hearing. *Id.* at 972a. Wigo also notified them that the School District was charging G.S. with the three aforementioned Level IV violations, *i.e.*, disruption of the school environment, harassment, and terroristic threats, on the basis of the criminal charges that were then pending against him, the nature of G.S.' Snapchat post, and the effect the post had on the School District community. *Id.* at 396a-97a, 972a.

The informal pre-expulsion hearing was then held on April 19, 2018, after which Wigo recommended to the School District's Board of Directors that G.S. be expelled from Penncrest. *Id.* at 401a-02a. Wigo based his recommendation on both the offending Snapchat post itself and the effect it had on the School District community, as well as on a prior incident in 2015, in which G.S. had been accused

---

[8] The family evaluation was conducted by Dr. Habony on April 7, 2018, and involved both G.S. and his parents. R.R. at 961a-65a. Dr. Habony determined that this "evaluation . . . suggests a family with financial and living challenges that create difficulties for everyone. However, the focus of the family is clearly 'family first.' It does appear that [G.S.'] needs are being met for safety, love, support and protection." *Id.* at 965. As a result, Dr. Habony concluded that family therapy was not necessary at that time, but recommended that G.S.' marijuana use be addressed, that he receive counseling to help him deal with his anxiety, and that he should return to school. *Id.* In addition, Dr. Habony stated in her summary and recommendations that "[G.S.] is not a violent or acting out [sic] young man but he is sensitive to the [accusations'] negative impact on his reputation[,]" as well as that "[G.S.] is perceived to be compliant with [Common Pleas'] expectations. He is not a disruptive or delinquent individual." *Id.*

of posting on social media that he was going to bring a gun to school and had a list of targets. *Id.* at 401a-02a, 475a-81a.[9]

Wigo's recommendation prompted the School District to convene a formal, multi-day pre-expulsion hearing before a hearing officer on May 3, May 22, and May 31, 2018. A litany of evidence and testimony was adduced at these hearings, which established, in an unrebutted fashion, that G.S.' Snapchat post only contained song lyrics, that he had not targeted or threatened specific people or groups through his post, and that, other than by virtue of G.S. being a Penncrest student, neither the timing of the post nor its content had a clear connection to the School District community. *See* R.R. at 32a-33a, 64a-66a, 75a, 88a, 124a, 143a-44a, 164a-65a, 175a-76a, 182a-84a, 232a-34a, 265a-66a, 278a-79a, 382a, 399a-400a, 441a, 465a-66a, 491a, 599a, 601a, 604a, 608a-11a, 615a, 633a, 637a-40a, 643a-44a, 656a-57a, 662a, 716a, 731a-32a, 741a-46a, 750a-51a, 957a-58a, 966a (regarding the contents and focus of G.S.' Snapchat post); *cf. id.* at 597a-98a, 606a-09a, 613a-17a, 620a-22a, 633a, 701a-08a, 713a, 717a, 725a-28a, 752a-54a, 955a-59a, 962a-65a (G.S.' parents and Dr. Habony did not consider him to be a violent person or a threat to the community).

Despite this, the hearing officer issued a report on August 13, 2018, through which he recommended to the School District's Board of Directors that G.S. be expelled from Penncrest. *Id.* at 855a. The hearing officer sidestepped the question of whether G.S.' post constituted a true threat of violence, but instead concluded that

---

[9] This 2015 incident stemmed from what G.S. and his family alleged were false accusations made by a fellow student with whom G.S. had previously been friends, and was resolved through a settlement, whereby G.S. was evaluated and given counseling, but not expelled or otherwise disciplined by the School District. *See* R.R. at 475a-86a, 621a-32a, 957a-58a. Even so, Wigo stated that he would have elected to continue on to the informal pre-expulsion hearing in 2018 even if the 2015 incident had not occurred, as he believed that G.S.' Snapchat post constituted a credible threat of violence. *Id.* at 506a, 519a-20a.

9

expulsion was warranted due to the harmful and substantially disruptive effect the post had upon the School District community. *Id.* at 837a-48a. In doing so, the hearing officer concluded that G.S.' post did not constitute speech that was protected by the First Amendment[10] and that the evidence supported each of the Level IV misconduct charges that had been lodged against G.S. *Id.* at 837a-48a, 854a. The School District's Board of Directors subsequently adopted the hearing officer's report, in full, on August 23, 2018, and expelled G.S. from Penncrest. G.S.' Br., App'x at A-1-A-3.

G.S. then appealed the School District's decision to Common Pleas, which took no additional evidence and, on July 27, 2020, reversed the School District's decision in part and affirmed it in part. Common Pleas ruled that the School District's determination that G.S. had made terroristic threats was not supported by substantial evidence, and reversed that portion of the School District's decision. Common Pleas Op., 7/27/20, at 9-10. Nevertheless, Common Pleas concluded that the School District had not abused its discretion by determining that G.S.' Snapchat post had constituted harassment and had disrupted the school environment, and affirmed the School District's expulsion of G.S. on those bases. *Id.* at 10-12.

These cross-appeals to our Court followed shortly thereafter.

---

[10] U.S. Const. amend. I.

## II. Discussion[11]

Though both G.S. and the School District raise a multiplicity of arguments in support of their respective appeals, we need only address a single question in order to resolve the entire matter: Did the School District violate G.S.' constitutional right to free speech, which is protected by both the United States Constitution's First Amendment[12] and Article I, Section 7 of the Pennsylvania Constitution,[13] by expelling him because of his Snapchat post?[14]

---

[11] Where, as here, a court of common pleas takes no additional evidence, our review of a school district's expulsion adjudication is limited to determining whether the school district committed an error of law, abused its discretion, or violated the expelled individual's constitutional rights. *Ream v. Centennial Sch. Dist.*, 765 A.2d 1195, 1196 (Pa. Cmwlth. 2001); *see* 2 Pa. C.S. § 754(b). "An abuse of discretion occurs when [necessary factual] findings [made by a school district] are not supported by substantial evidence in the record." *Coal Gas Recovery, L.P. v. Franklin Twp. Zoning Hr'g Bd.*, 944 A.2d 832, 838 (Pa. Cmwlth. 2008). "By 'substantial evidence' we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 640 (Pa. 1983) (citations omitted).

[12] The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

[13] In relevant part, Article I, Section 7 provides: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." Pa. Const. art. I, § 7.

[14] For sake of completeness, we summarize the parties' respective arguments as follows. G.S. claims that: (1) His Snapchat post was constitutionally protected free speech, for which he should not have been expelled. G.S.' Br. at 16-27; G.S.' Second Br. at 5-13; G.S.' Suppl. Br. at 1-10; (2) The School District did not announce its policy of treating all potential threats of violence as being actual, credible threats until after G.S. had put up the offending post and the subsequent disruption had ensued. As such, punishing him pursuant to this after-announced policy violated G.S.' due process rights under the United States Constitution's Fourteenth Amendment, U.S. Const. amend. XIV, as well as the prohibitions against *ex post facto* laws contained in both the United States Constitution and the Pennsylvania Constitution. G.S.' Br. at 28; G.S.' Second Br. at
**(Footnote continued on next page…)**

11

## A. The Constitutional Right to Freedom of Speech

The First Amendment provides, in relevant part, that Congress shall make no law "abridging the freedom of speech." U.S. CONST. AMEND. I; *Barr v. Am. Ass'n of Political Consultants*, . . . 140 S. Ct. 2335, 2346 . . . (2020). The First Amendment's free-speech clause is made applicable to the states through the Fourteenth Amendment. *Manhattan Cmty. Access Corp. v. Halleck*, . . . 139 S. Ct. 1921, 1928 . . . (2019).

---

13-15; (3) The School District's policy of treating all potential threats as actual, credible threats is overbroad and unduly vague, in violation of the First and Fourteenth Amendments, as well as Article I, Section 7 of the Pennsylvania Constitution. G.S.' Br. at 29-32; G.S.' Second Br. at 17-20; and (4) Common Pleas properly concluded that the School Board's terroristic threat determination was not supported by substantial evidence. G.S.' Second Br. at 2-5.

As for the School District, it claims: (1) G.S.' Snapchat post was not constitutionally protected speech and, instead, was a true threat under the objective reasonable person standard set forth by the Pennsylvania Supreme Court in *J.S. ex rel. H.S. v. Bethlehem Area School District*, 807 A.2d 847 (Pa. 2002). School District's Br. at 12-24; School District's Reply Br. at 9-10; School District's Suppl. Br. at 3-10; (2) G.S. waived his due process and *ex post facto* arguments by failing to raise them before this stage in the proceedings. School District's Br. at 26-27; (3) Even if waiver did not occur, the aforementioned School District policy is not a law and, thus, is not barred by the constitutional provisions that prohibit *ex post facto* laws. Furthermore, the School District did not violate G.S.' due process rights, because it expelled him due to his violation of the Student Discipline Code, not because it considered any potential threat to be credible. School District's Br. at 25-28; School District's Reply Br. at 10-11; (4) G.S. also waived his vagueness and overbreadth arguments by failing to raise them in the Statement of Errors Complained of on Appeal he filed with Common Pleas. School District's Br. at 28; (5) Even if this waiver did not occur, G.S.' expulsion was not based on an unduly vague or overly broad policy. At most, Superintendent Wigo's statement about treating all potential threats as credible was an administrative regulation, rather than a codified part of the Student Discipline Code. Furthermore, the Student Discipline Code clearly states that threats and harassment are potential grounds for expulsion, so the Student Discipline Code, as applied to this situation, is not impermissibly vague or overbroad. School District's Br. at 27-28; School District's Reply Br. at 11-12; and (6) Common Pleas erred by reversing the School District's determination that G.S.' Snapchat post constituted terroristic threats. In doing so, Common Pleas improperly applied the Crimes Code's definition of terroristic threats to this matter. Instead, Common Pleas should have used the objective test articulated by our Supreme Court in *Bethlehem Area School District* to determine whether the School District's conclusion that a reasonable person would have interpreted G.S.' post as a true threat was supported by substantial evidence. School District's Br. at 29-30; School District's Reply Br. at 1-9.

It is beyond cavil that our political and cultural lives rest upon the principle, guaranteed by the First Amendment, "that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. v. FCC*, 512 U.S. [622,] 641 [(1994)]. Accordingly, the First Amendment precludes the government from restricting expression due to its message, ideas, subject matter, or content. *Police [Dep't] of Chicago v. Mosley*, 408 U.S. 92, 95 . . . (1972). One's constitutional right to free speech, however, while fundamental, is not absolute. *Neb. Press Ass'n [v. Stuart]*, 427 U.S.[ 539,] 570 [(1976)]. Freedom of speech "does not comprehend the right to speak on any subject at any time." [*Am. Commc'ns Ass'n*] *v. Douds*, 339 U.S. 382, 394 . . . (1950). Instead, First Amendment freedoms must be "applied in light of the special characteristics of the [relevant] environment." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 . . . (1969).

*S.B. v. S.S.*, 243 A.3d 90, 104 (Pa. 2020).

The First Amendment merely creates the floor for determining the breadth of such rights in our Commonwealth, due to the Pennsylvania Constitution's own, longstanding provisions that protect the individual's ability to speak freely without governmental interference.

> [Our Supreme] Court . . . has long recognized that freedom of expression . . .
>
> > has special meaning for this Commonwealth, whose founder, William Penn, was prosecuted in England for the "crime" of preaching to an unlawful assembly and persecuted by the court for daring to proclaim his right to a trial by an uncoerced jury. It is small wonder, then, that the rights of freedom of speech, assembly, and petition have been guaranteed since the first Pennsylvania Constitution, not simply as restrictions on the powers of government, as found in the Federal Constitution, but as inherent and "invaluable" rights of man.

13

[*Com. v. Tate*, 432 A.2d 1382, 1388 (Pa. 1981)] (footnote omitted).

. . . .

The protections afforded by Article I, [Section] 7 thus are distinct and firmly rooted in Pennsylvania history and experience. The provision is an ancestor, not a stepchild, of the First Amendment.

*Pap's A.M. v. City of Erie*, 812 A.2d 591, 604-05 (Pa. 2002). Consequently, it is beyond dispute that "Article I, [Section] 7 . . . provides protection for freedom of expression that is broader than the federal constitutional guarantee." *Bureau of Pro. & Occupational Affs. v. State Bd. of Physical Therapy*, 728 A.2d 340, 343-44 (Pa. 1999).

In this instance, though, G.S. does not insist that he is entitled to such heightened protection. Instead, he presents us with a free speech argument that blends his federal and state constitutional claims together, without asserting that his Snapchat post should be treated any differently under Article I, Section 7 than it should be under the First Amendment. *See* G.S.' Br. at 16-27; G.S.' Second Br. at 5-13; G.S.' Suppl. Br. at 1-10. Therefore, we assume, but do not decide, that G.S.' free speech rights in this instance are coextensive under both the Pennsylvania Constitution and the United States Constitution.[15]

### B. Public Schools and the Regulation of Students' Speech

The Supreme Courts of our Commonwealth and our nation have long recognized the inherent tension between students' First Amendment-based right to freedom of speech and public schools' ability to control their charges' expressive conduct or to mete out discipline. The seminal case in this realm is undoubtedly

---

[15] We also note that our Supreme Court has implied that, unless a litigant establishes that their case's particular circumstances entitle them to broader free speech rights under the Pennsylvania Constitution, it is presumed "that the protections afforded by the First Amendment and Article I, Section 7 are coextensive." *See S.B.*, 243 A.3d at 112.

*Tinker*, in which three teenagers resolved during December 1965 to wear black armbands to school for the remainder of the year, as a form of protest against the Vietnam War and to show their support for ending that conflict. 393 U.S. at 504. Officials from the Des Moines Independent Community School District (Independent District), where these teenagers were being educated, got wind of this plan and swiftly adopted a policy that prohibited the Independent District's students from wearing armbands to school, with the penalty for defiance being a suspension that would last until a suspended student agreed to comply with the prohibition. *Id.* Even so, all three teenagers wore their armbands to school and were consequently sent home for violating the Independent District's armband ban. *Id.*

This prompted the teenagers, through their fathers, to seek injunctive relief in federal district court that would bar the Independent District from disciplining them, on the basis that the ban violated their free speech rights under the First Amendment. *Id.* The district court ruled in favor of the Independent District, a decision which the United States Court of Appeals for the Eighth Circuit affirmed via an equally divided *en banc* panel, but the Supreme Court ultimately ruled that the ban indeed ran afoul of the First Amendment and reversed on that basis. *Id.* at 504-14. In doing so, the *Tinker* Court recognized the countervailing interests at play, noting that, on one hand,

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.
>
> . . . .
>
> On the other hand, [we have] repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct

15

> in the schools. . . . Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities.

*Id.* at 506-07 (citation omitted). The *Tinker* Court reasoned that the teenagers' expressive conduct, which was passive and caused minimal disruption to the school environment, fell squarely within the protection of the First Amendment and, therefore, the Independent District could not prohibit them from, or punish them for, wearing their armbands. *Id.* at 507-11. More broadly, though, the *Tinker* Court made clear that students' expressive rights in the school environment are neither merely confined to the classroom, nor without limitation:

> When [a student] is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others. . . . But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id.* at 512-13 (citations and some punctuation omitted). In short, *Tinker* established a legal framework for determining the breadth of students' First Amendment rights, and of public schools' disciplinary powers, in the context of incidents that occur on-campus.

Left unresolved, however, was the question of how far public schools' reach extends when it comes to regulating their students' *off-campus* conduct or to meting out punishment for behavior occurring beyond the physical confines of the school environment. This jurisprudential gap remained largely unfilled for more than 50 years, until the United States Supreme Court addressed it recently in *Mahanoy Area*

16

*School District v. B.L. by & through Levy*, 141 S. Ct. 2038 (2021). In *Mahanoy Area School District*, B.L., who was in ninth grade at the time, made two Snapchat posts over the course of a weekend, through which she expressed her displeasure at neither making the varsity cheerleading team at her high school, nor getting picked for her desired position on a private softball team.

> The first image B.L. posted [on Snapchat] showed B.L. and a friend with middle fingers raised; it bore the caption: "Fuck school fuck softball fuck cheer fuck everything." . . . The second image was blank but for a caption, which read: "Love how me and [another student] get told we need a year of [junior varsity] before we make varsity but tha[t] doesn't matter to anyone else?" The caption also contained an upside-down smiley-face emoji.

*Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2043 (internal citations omitted). These posts spread from B.L.'s Snapchat followers to other members of the community and eventually reached her high school cheerleading coaches. *Id.* After discussing the matter with the high school's principal, B.L.'s coaches suspended her from the junior varsity cheerleading team for the upcoming year, a decision that was also upheld by "[t]he school's athletic director, principal, superintendent, and school board[.]" *Id.*

B.L. and her parents then challenged the suspension by filing suit in federal district court. *Id.* at 2043. After obtaining a temporary restraining order and an injunction restoring B.L. to the junior varsity cheerleading team, they were granted summary judgment, on the basis that suspending B.L. for her Snapchat posts violated her First Amendment rights. *Id.* at 2043-44. The Third Circuit affirmed, as did the Supreme Court, albeit on narrower grounds than the Third Circuit. *Id.* at 2044-48.

In doing so, the Supreme Court first reiterated that a balance must be struck between students' constitutional right to free speech and public schools' interest in maintaining an orderly and secure educational environment, before casting aside the

17

Third Circuit's holding that public schools could not punish students for off-campus speech without violating the First Amendment. *Id.* at 2044-45. While the Supreme Court declined to categorically delineate the extent to which schools could control their students' off-campus speech, the Court did see fit to

mention three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech. Those features diminish the strength of the unique educational characteristics that might call for special First Amendment leeway.

First, a school, in relation to off-campus speech, will rarely stand *in loco parentis*. The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them. Geographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility.

Second, from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day. That means courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all. When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention.

Third, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection. . . .

18

> Given the many different kinds of off-campus speech, the different potential school-related and circumstance-specific justifications, and the differing extent to which those justifications may call for First Amendment leeway, we can, as a general matter, say little more than this: Taken together, these three features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished.

*Id.* at 2045-46.

Even more recently, during the interregnum between oral argument in this matter and the publication of this opinion, our Commonwealth's Supreme Court decided *J.S. by M.S. v. Manheim Township School District*, ___ A.3d ___, (Pa., No. 2 MAP 2021, filed Nov. 17, 2021), 2021 WL 5350219, in which it used this jurisprudential scaffolding to more concretely flesh out the limits imposed by the First Amendment[16] upon public schools' disciplinary reach. In *Manheim Township School District*, J.S. and a friend engaged in a conversation over social media, during which they privately mocked a fellow student at their high school for having long hair and regularly wearing a shirt from the band Cannibal Corpse.[17] ___ A.3d at ___, slip op. at 2, 2021 WL 5350219, at *1. They jokingly suggested to each other that this made the student look like a school shooter, which led J.S. to send two memes to his friend through Snapchat via direct message. *Id.* The first meme was a picture of the student singing into a microphone while J.S. watched the "performance" through a pair of comically oversized glasses; this meme was captioned, "I'm

---

[16] Though *Manheim Township School District* was heard in state court, the plaintiff in that matter made no reference to Article I, Section 7, and instead based his constitutional freedom of speech arguments solely upon the First Amendment. ___ A.3d at ___, slip op. at 2-3, 2021 WL 5350219, at *1.

[17] Like Spite, "Cannibal Corpse is a . . . band whose genre is death metal . . . and whose songs use violent lyrics and graphic imagery drawn from horror fiction and films." ___ A.3d at ___, slip op. at 2, 2021 WL 5350219, at *1.

shooting up the school this week. I can't take it anymore I'm DONE!" ___ A.3d at ___, slip op. at 3, 2021 WL 5350219, at *2. The second meme was a short video of the student playing guitar, and was captioned, "I[']M READY [J.S.' friend] AND MANY MORE WILL PERISH IN THIS STORM. I WILL TRY TO TAKE [J.S.' friend] ALIVE AND TIE HIM UP AND EAT HIM." *Id.* J.S.' friend then reposted the first meme to his own Snapchat account, thereby turning what had previously been a private communication into one that was publically available to his Snapchat followers, before taking it down roughly five minutes later at J.S.' request. *Id.* Despite the first meme's brief period of public visibility, it was still seen by 20 to 40 other Snapchat users and was eventually passed on in screenshot form to the local high school principal. ___ A.3d at ___, slip op. at 4, 2021 WL 5350219, at *2. The principal contacted Manheim Township School District's (Manheim District) assistant superintendent and the local police to inform them about the meme. *Id.* After interviewing J.S. and his family, the police concluded that the meme was not indicative of a threat to public safety and notified Manheim District that school could take place as normal later that day. *Id.* Thereafter, the assistant superintendent emailed the community's parents and teachers and, despite what the police had said, nevertheless stated that a threat had been posted on social media, but that the high school was now considered to be safe. *Id.* J.S. was subsequently suspended from school and, after conducting an investigation and a hearing, the local school board expelled J.S. for violating Manheim District's student policies by engaging in cyberbullying and making terroristic threats. ___ A.3d at ___, slip op. at 4-6, 2021 WL 5350219, at *2-*3.

J.S. appealed his expulsion to the Court of Common Pleas of Lancaster County, arguing that this adjudication was not supported by substantial evidence, as

well as that he had not received adequate due process because he had been unable to cross-examine his friend during the hearing. ___ A.3d at ___, slip op. at 6, 2021 WL 5350219, at *3. The Court of Common Pleas of Lancaster County reversed the adjudication, concluding that J.S.' constitutional rights to due process and free speech had been violated, as well as that the cyberbullying finding was not supported by substantial evidence, and ordered Manheim District to expunge J.S.' expulsion. ___ A.3d at ___, slip op. at 6-11, 2021 WL 5350219, at *3-*5. Manheim District appealed this decision to our Court, whereupon we adopted the Court of Common Pleas of Lancaster County's well-reasoned opinion and affirmed the lower court in full. ___ A.3d at ___, slip op. at 11, 2021 WL 5350219, at *5; *see J.S. v. Manheim Twp. Sch. Dist.*, 231 A.3d 1044, 1045 (Pa. Cmwlth. 2020).

The Pennsylvania Supreme Court granted *allocatur* and ultimately affirmed our ruling, on the basis that Manheim District had violated J.S.' right to free speech under the First Amendment. After providing a lengthy review of First Amendment case law, our Supreme Court held that, in the context of school discipline, the totality of the circumstances must be considered in determining whether a student's conduct or speech constitutes a true threat, with "the primary focus . . . on the subjective intent of the speaker." ___ A.3d at ___, slip op. at 18-34, 2021 WL 5350219, at *8-*15; *cf. Watts v. United States*, 89 S. Ct. 1399 (1969) (true threats of violence or harm are not protected by the First Amendment). Elaborating on this conclusion, the *Manheim* Court explained that

> the inquiry is ultimately driven by whether the speaker intended the communication to be a serious expression of an intent to inflict harm, *i.e.*, intended to intimidate or threaten the recipient of the message.[] Consideration of additional circumstances surrounding the speech at issue accounts for the special role that schools play in educating our youth in a productive school environment and the need

to protect students from harm as well, recognizing students' more limited free speech rights. However, an inquiry driven by the intent of the speaker is necessary so that student speech is not unduly prohibited. As well, a subjective approach takes into account the unique vagaries presented by a student speaker, including the student's age, maturity, and lack of judgment. This is especially important for off-campus speech, including in the home, where the authority of the school is diminished and parental control is increased.

*Manheim Twp. Sch. Dist.*, ___ A.3d at ___, slip op. at 33-34, 2021 WL 5350219, at *15 (footnote omitted). To that end, the *Manheim* Court fashioned a two-part test, through which the substance of the offending conduct or speech is considered first, followed then by examination of the context in which that conduct or speech occurred. ___ A.3d at ___, slip op. at 34, 2021 WL 5350219, at *16.[18] Applying this test to J.S.' situation, our Supreme Court ruled that his memes were not true threats. ___ A.3d at ___, slip op. at 34-38, 2021 WL 5350219, at *16-*17.

This conclusion did not mark the end of the *Manheim* Court's analysis, however, as it noted that *Tinker* also permits schools to mete out punishment in situations where a student's speech "causes or foreseeably could cause a substantial disruption to the school environment. . . . [s]pecifically . . . [regarding] the necessities for discipline in the school[]or . . . the rights of others." ___ A.3d at ___, slip op. at

---

[18] The *Manheim* Court provided the following, non-exhaustive list of "contextual factors" to consider for the second part of the true threat test:

> (1) the language employed by the speaker; (2) whether the statement constituted political hyperbole, jest, or satire; (3) whether the speech was of the type that often involves inexact and abusive language; (4) whether the threat was conditional; (5) whether it was communicated directly to the victim; (6) whether the victim had reason to believe the speaker had a propensity to engage in violence; and (7) how the listeners reacted to the speech.

*Manheim Twp. Sch. Dist.*, ___ A.3d at ___, slip op. at 34, 2021 WL 5350219, at *16.

38-39, 2021 WL 5350219, at \*18. Our Supreme Court made clear that this carve-out is limited in scope, noting

> that mere "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." [*Tinker*, 393 U.S.] at 508. Consistent therewith, our Court, relying on *Tinker*, has explained that, while there must be more than mild distraction or curiosity caused by the speech, complete chaos is not required in order for a school district to punish student speech. *Bethlehem Area* [*Sch. Dist.*], 807 A.2d at 868-69. Additionally, as noted above, after *Mahanoy* [*Area School District*], *Tinker*'s substantial disruption test may apply to off-campus speech, but additional factors – such as consideration of the reduced role of *in loco parentis* authority, the 24/7 nature of off-campus speech regulation, and the school's interest in protecting unpopular expression – have seemingly become part of the substantial disruption calculus. *Mahanoy* [*Area Sch. Dist.*], 141 S. Ct. at 2046.

___ A.3d at ___, slip op. at 39, 2021 WL 5350219, at \*18. In J.S.' situation, our Supreme Court reasoned that, though his memes had caused his fellow students to become somewhat concerned, the police to temporarily increase their on-campus presence, and Manheim District to investigate whether there was a legitimate threat to public safety, they had not substantially disrupted the school environment.[19] ___ A.3d at ___, slip op. at 40-41, 2021 WL 5350219, at \*19. Consequently, the real-world impact of his memes did not rise to a level of severity that rendered his expulsion constitutional in nature. ___ A.3d at ___, slip op. at 40-42, 2021 WL 5350219, at \*19.

---

[19] In fact, our Supreme Court placed most of the blame for the resulting situation upon Manheim District, in that "it was [Manheim] District that created a disruption by sending an email to parents that a threat had been received." *Manheim Twp. Sch. Dist.*, ___ A.3d at ___, slip op. at 40, 2021 WL 5350219, at \*19.

## C. Freedom of Speech in the Context of G.S.' Snapchat Post

With all of this in mind, we return to the question currently before us: Did the School District violate G.S.' constitutional right to free speech, as protected through both the First Amendment and Article I, Section 7, by expelling him because of his Snapchat post?

### 1. True Threat

Initially, we note that much of the School District's argumentation is based upon its position that G.S.' post constituted a true threat, as well as that it was both legally proper and factually justified for it to expel G.S. on that basis. *See* School District's Br. at 10-13, 17-23, 30; School District's Reply Br. at 1-9; School District's Suppl. Br. at 6, 9. Similarly, G.S. spends a good portion of his briefs contesting those very ideas. *See* G.S.' Br. at 21-23; G.S.' Second Br. at 8-10; G.S.' Suppl. Br. at 1, 5-8. These positions, however, misapprehend the actual reasoning employed by the School District's hearing officer in his August 13, 2018 report. As we have already mentioned, the hearing officer declined the opportunity to decide whether the offending post was a true threat; indeed, the hearing officer remarked that "it is not necessary in this matter to make [that] determination[.]" R.R. at 838a. Instead, the hearing officer reasoned that the charges against G.S. should be sustained and G.S. should be expelled, as well as that the School District could do so without violating G.S.' free speech rights, because his post "materially disrupted class work, involved substantial disorder[,] and invaded the rights of others." *Id.* at 844a; *see id.* at 838a-48a, 850a-51a. In other words, the hearing officer concluded that such punishment was warranted because G.S. had substantially disrupted the

24

school environment, *not* because he had issued a true threat.[20] Given that the School District adopted the August 13, 2018 report wholesale, it cannot now seek to retroactively expand or revise its justification for expelling G.S. The true threat analysis discussed above is therefore inapplicable to this matter.

## 2. Substantial Disruption

What is left for us to decide, then, is whether the School District properly determined that G.S.' Snapchat post had substantially disrupted the school environment at Penncrest, such that his expulsion did not contravene his constitutional right to free speech. Though G.S.' post sparked a chain of events that undoubtedly led to the disruption of normal operations at Penncrest, and resulted in communal agitation and fear, we nevertheless conclude that his post was constitutionally protected speech, for which the School District could not punish him. We acknowledge that the content of G.S.' post is disturbing, facially speaking, in that its wording appears to express the author's generalized feeling of existential anger and homicidal intent. Therefore, it is understandable that this post would initially cause great concern and, given the exigencies of the moment, that the School District would elect to suspend G.S. while it investigated the matter. Likewise, it is indisputable that there is a "strong public interest in reducing the level of violence within our schools and in the community in general, that it is of paramount importance that our schools must be kept as centers of learning free of fear for personal safety[,]" and, furthermore, that "[t]his concept of safety encompasses the notion of teachers and students being secure and free from the fear of becoming victims of senseless violence." *In re B.R.*, 732 A.2d 633, 639 (Pa. Super. 1999). Even

---

[20] It is possible that the hearing officer caused confusion by recommending that G.S. be expelled for making *terroristic* threats, without actually determining whether G.S.' Snapchat post constituted a *true* threat.

so, the First Amendment and Article I, Section 7 mandate that public schools cannot exert control over their students' off-campus speech unless there is a strong nexus between a given student's expressive conduct and their school, such that when properly contextualized, the offending speech is shown to have been clearly targeted at a member or members of their school community or clearly pertained to school activities.[21] *See Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2046 (schools' lack of off-campus *in loco parentis* authority and interest in protecting students' ability to express themselves in unpopular ways, coupled with practical impact of allowing schools to broadly regulate all student speech, "mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished"); *Tinker*, 393 U.S. at 509 ("undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression").

In this instance, G.S. did not explicitly target specific Penncrest students, let alone the broader School District community, and he posted at a time when he was neither at Penncrest nor engaged in school-related activities. Thus, G.S.' post was unambiguously off-campus speech, regarding which the School District's disciplinary reach was sharply circumscribed by both the First Amendment and Article I, Section 7. Given this, and no matter how objectionable the content of G.S.'

_____

[21]     [The Pennsylvania Supreme] Court has mandated an intermediate standard of proof—clear and convincing evidence—when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money. Notwithstanding the state's civil labels and good intentions, the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma.

*Com. v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003) (quoting *Com. v. Williams*, 733 A.2d 593, 605 (Pa. 1999)).

post may have been, it is evident that the School District markedly failed to clear the extremely high bar set by these constitutional provisions and, thus, could not punish him for the disruptions that occurred at Penncrest. As already noted, there is no dispute that G.S.' post only contained lyrics from a song he enjoyed. In addition, G.S. repeatedly and consistently insisted that he neither meant harm nor desired to hurt anyone, and had his character attested to by his parents and Dr. Habony, who each maintained that G.S. was not a violent person or a threat to others. The School District, by contrast, neglected to substantively rebut these assertions and instead posited that the plain wording of G.S.' post, coupled with the public's reaction thereto and the criminal charges that were lodged against him, *ipso facto* established that he had intended to harm members of the School District community. *See* R.R. at 837a; School District's Br. at 12-23. This argument underpins, in large part, the School District's position that G.S.' expulsion was sound because "[the post] was circulated among Penncrest students and their families, and [created] fear in the community [that] caused substantial disruption at Penncrest in the days that followed." School District's Br. at 24.

Thus, the School District would have us evaluate the constitutional sanctity of disciplining students for disruptions caused by off-campus speech through an analytical framework that would assign great value to the societal response to such speech, but disregard the context in which it was uttered, as well as the intent of the speaker. We decline to accept the School District's deeply problematic suggestion. Were we to do otherwise, the result would be to imbue public schools with the power to discipline their students for publically expressing interests or sentiments that school administrators, faculty, or members of polite society considered execrable or simply did not understand, regardless of how, when, where, or why that expressive

27

conduct occurred. Public schools would consequently become *de facto* full-time censors, preventing children from making their own decisions about what aspects of popular culture are worthy of consumption or what beliefs should be held, and interfering with parental authority, through a constant potential for punishment that would hang over students like the Sword of Damocles. Such an expansion of governmental authority would do great harm to the expressive rights of individuals still "in the formative years we ourselves once knew, when wounds can be so grievous, disappointment so profound, and mistaken choices so tragic, but when moral acts and self-fulfillment are still in reach." *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 248 (2002). While public schools' reactions to students' disturbing speech may be, as in this instance, ostensibly intended to protect their staff and communities, "[t]he Constitution exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed. What the Constitution says is that these judgments are for the individual to make, not for the [g]overnment to decree, even with the mandate or approval of a majority." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000); *see also FCC v. Pacifica Found*., 438 U.S. 726, 745 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection."). Public schools may certainly take appropriate, good faith steps to protect their communities in fluid situations where it is unclear whether a student's off-campus speech indicates genuinely harmful intent, as neither the First Amendment nor Article I, Section 7 require that they sit on their proverbial hands until a potential threat comes into actual fruition. However, where a student's properly contextualized, off-campus speech is not distinctly connected to

school activities or clearly directed towards members of their educational community, a public school's reach exceeds its constitutional grasp if it seeks to punish that student for any disruption to normal school operations that results from that speech.[22] Thus, as the record is devoid of any proof that there was a link between G.S.' post and his high school or his fellow students, the School District's decision to expel him from Penncrest violated both the First Amendment and Article I, Section 7.

### III. Conclusion

Therefore, we affirm Common Pleas' July 27, 2020 order in part as to its partial reversal of the School District's August 23, 2018 adjudication, but do so on the alternate basis[23] that the School District's expulsion of G.S. for making terroristic threats violated his constitutional right to free speech, and otherwise reverse Common Pleas' order.

_____
ELLEN CEISLER, Judge

---

[22] This is especially true in situations like this one, where the School District punished G.S. for the disruption that ensued after he put up his post, even though the record reflects that those disturbances were more precisely attributable to widespread misinterpretation and misjudgment of the import and provenance of the words the post contained.

[23] As mentioned *supra*, Common Pleas ruled that the School District's finding that G.S. had made a terroristic threat through his Snapchat post was not supported by substantial evidence.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Appeal of G.S., a Minor, by and through his Parents, Erin and Jason Snyder, | : | |
| | : | |
| | : | |
| Appellants | : | No. 843 C.D. 2020 |
| | : | |
| From the Decision by the Rose Tree Media School District, A Local Agency | : | |
| | : | |
| | : | |
| | : | |
| Appeal of G.S., a Minor, by and through his Parents, Erin and Jason Snyder | : | |
| | : | |
| | : | |
| | : | |
| From the Decision by the Rose Tree Media School District, a Local Agency | : | No. 869 C.D. 2020 |
| | : | |
| | : | |
| | : | |
| Appeal of: Rose Tree Media School District | : | |
| | : | |

# **O R D E R**

AND NOW, this 7th day of January, 2022, it is hereby ORDERED that the Court of Common Pleas of Delaware County's (Common Pleas) July 27, 2020 order is AFFIRMED IN PART, as to its partial reversal of the Rose Tree Media School District, A Local Agency's August 23, 2018 adjudication. It is FURTHER ORDERED that Common Pleas' July 27, 2020 order is otherwise REVERSED.

_____
ELLEN CEISLER, Judge